UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

GEORGE STOYTCHEV,

Plaintiff,

-against-

CITY OF YONKERS, YONKERS POLICE DEPARTMENT, POLICE OFFICER DOYLE, POLICE OFFICER CRONIN, POLICE OFFICER GEORGE, POLICE OFFICER RISSDORFER, POLICE OFFICER KUSIK, and JOHN DOES 1 THROUGH JOHN DOE 5, *being unnamed police officers involved in the incident*,

Defendants.
---------------------------------------------------------------X

**DECISION AND ORDER**

22 Civ. 8877 (AEK)

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**

Plaintiff George Stoytchev ("Stoytchev"), then proceeding *pro se*, commenced this action on October 18, 2022. ECF No. 1 ("Complaint" or Compl."). Following the substantial completion of fact discovery, Stoytchev, now represented by counsel, brings a motion for leave to amend the Complaint. ECF No. 116. For the reasons that follow, Stoytchev's motion is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

### I. The Original Complaint

The following is a recitation of the allegations set forth in the original Complaint.[1]

[1] Excluded from this summary are allegations related to incidents that occurred in 2018. In a stipulation that was "so ordered" by the Court, the parties agreed to the dismissal of "any and all causes of actions [*sic*] and claims arising out of incidents occurring on or about August 20, 2018, and on or about September 27, 2018, insofar as such causes of actions [*sic*] and claims were untimely commenced and barred by the statute of limitations . . . ." ECF No. 35.

At approximately 11:35 p.m. on July 29, 2019, Stoytchev was a passenger in a friend's vehicle, which was parked near Buena Vista Avenue and Main Street in Yonkers. Compl. ¶ 17. After Stoytchev exited the vehicle to meet someone at 1 Pierrepont Street, several Yonkers police officers approached him, stopped him, turned him around, and forced him back toward the vehicle. *Id.* The officers searched the vehicle and allegedly discovered controlled substances. *Id.* ¶¶ 17-18. Stoytchev disputed ownership of the drugs and refused to submit to a "breath test." *Id.* ¶ 18. The officers then allegedly threw him to the ground, arrested him, and charged him with "Driving While Ability Impaired" under the New York Vehicle and Traffic Law ("VTL"). *Id.* Those charges were later dismissed. *Id.*

Approximately two weeks later, on August 10, 2019, Stoytchev was driven by a friend to 3 Schroeder Street in Yonkers to pick up his girlfriend. *Id.* ¶ 20. When he returned to the vehicle, he discovered that multiple Yonkers police vehicles had surrounded it and that at least eight officers were searching the car. *Id*. ¶¶ 21-22. As Stoytchev approached, officers allegedly bent him over the hood of the vehicle, handcuffed him, and arrested him for possession of a controlled substance. *Id*. ¶ 22. These charges were later dropped. *Id*.

On August 25, 2019, Stoytchev was using his girlfriend's vehicle with her permission, but later in the day, his girlfriend, while intoxicated, reported the vehicle stolen. *Id*. ¶ 19. Police officers arrested Stoytchev for possession of stolen property at his place of business, located at 837 McLean Avenue in Yonkers. *Id*. The vehicle was impounded and later sold at auction, and the criminal charges were ultimately dismissed. *Id*.

Less than one month later, on September 22, 2019, at approximately 3:15 a.m., Stoytchev drove to 7 Schroeder Street to pick up a friend for a fishing trip. *Id*. ¶ 23. While he was waiting outside his friend's residence, a car drove up alongside his vehicle; when the passenger from this

other car exited, the passenger's door struck Stoytchev's car and made a dent. *Id.* This led to an altercation between Stoytchev and another individual. *Id.* ¶ 24. Yonkers police officers responded and arrested Stoytchev for a variety of charges, including resisting arrest. *Id.* During the arrest, officers allegedly threw Stoytchev to the ground, "hog-cuffed" him, and sat on him, making it difficult for him to breathe. *Id.* ¶ 25.

On October 18, 2019, at approximately 11:00 p.m., Stoytchev and his girlfriend went to visit her friend at the Schlobohm Houses on Schroeder Street in Yonkers, where they engaged in a verbal dispute that resulted in security personnel contacting the police. *Id.* ¶ 28. Officers arrested Stoytchev and removed him from the property. *Id.* When he was released, he returned to the vicinity of the Schlobohm Houses to retrieve his keys, wallet, and phone, which were in his girlfriend's car, but when he arrived, he found that his girlfriend was no longer there. *Id.* ¶¶ 28-29. Stoytchev went to the security booth at the Schlobohm Houses to request to use the phone; the security officer refused, and proceeded to contact the Yonkers Police Department ("YPD"). *Id.* ¶ 29. More than six patrol cars carrying approximately eight officers responded. *Id.* ¶ 30. According to Stoytchev, the officers approached with weapons drawn, ordered him to the ground, handcuffed him, shackled his legs, placed a knee on his neck, and kicked him in the back of his head. *Id.* ¶¶ 30-31. Stoytchev suffered facial and cranial lacerations and lost four teeth. *Id.* ¶ 31. During the incident, another officer allegedly exclaimed, "Hey Doyle, why did you do that?" after one officer kicked Stoytchev in the head. *Id.* ¶ 32. Stoytchev was then transported to St. Joseph's Medical Center, where officers allegedly mocked his injuries while he received treatment. *Id.* ¶ 33.

Stoytchev alleged that the City of Yonkers (the "City") "maintained an utterly broken system for reviewing and disciplining allegations of excessive force by its officers." *Id.* ¶ 36.

The original Complaint asserted that officers accused of using excessive force were investigated by other YPD officers who were biased in favor of their colleagues, and who protected the accused officers from "facing meaningful scrutiny for their actions." *Id.* ¶ 37; *see also id.* ¶¶ 38-39.

In addition to naming the City as a defendant,[2] the original Complaint named Officers Doyle, Cronin, George, Rissdorfer, and Kusik as individual defendants, *id.* ¶¶ 5-9, as well as John Doe 1 through John Doe 5—*i.e.*, "other as-yet-unidentified defendant police officers who might have been present at the scene" of Stoytchev's "encounter with the police," *id.* ¶ 10.

Based on the foregoing allegations, Stoytchev asserted five causes of action: (1) a claim under 42 U.S.C. § 1983 for violation of his Fourth Amendment rights based on the use of excessive force, including a claim against the defendant officers for "fail[ing] to intervene to stop the violation," *id.* ¶¶ 43-48; (2) a claim under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment rights based on deliberate indifference to his medical/mental health needs, *id.* ¶¶ 49-53; (3) a state common law claim for intentional infliction of emotional distress based on officers "assaulting, restraining and taunting" him, *id.* ¶¶ 54-59; (4) a state common law claim for battery based on the allegations of the use of excessive force, *id.* ¶¶ 60-65; and (5) a state common law claim for negligence and gross negligence based on the breach of the "duty of reasonable care" when the defendant officers "encountered him in the early morning hours of October 19, 2019 experiencing a severe mental health crisis," *id.* ¶ 67. The federal law claims included allegations of municipal liability against the City, *id.* ¶¶ 46, 51, although the only specific allegation of a

[2] The original Complaint also names the YPD as a defendant, but the YPD is not a properly named party because, as an agency of the City, it does not have the capacity to be sued. *See Smith v. Westhab Traverse House*, No. 24-cv-4961 (LTS), 2025 WL 26067, at *1 (S.D.N.Y. Jan. 2, 2025). Appropriately, Stoytchev's proposed amended pleading removes the YPD as a defendant.

defective municipal policy related to the City's "utterly broken" system for reviewing use of force incidents and disciplining officers involved, *id.* ¶¶ 36, 46.[3] The state law claims included allegations of *respondeat superior* liability against the City. *Id.* ¶¶ 56, 64, 70.

## II. The Proposed First Amended Complaint

### A. The Parties

In his proposed amended pleading, Stoytchev identifies additional officers allegedly involved in the five incidents, withdraws claims against certain previously-named defendants, and adds allegations concerning the YPD's treatment of individuals experiencing mental health crises and various events following the October 19, 2019 arrest. ECF No. 117-1 ("Proposed First Amended Complaint" or "FAC"). The Proposed First Amended Complaint retains Officers Doyle and Kusick as defendants,[4] drops Officers Cronin, George, and Rissdorfer as defendants, and adds Officers Joseph Nieves, Joseph Reagan, Richard Windisch, Thomas Ball, Andrew Lane, Matthew Berni, Alejandro Vieira, and Roberto Macias as defendants. FAC ¶¶ 15-24. It also asserts claims against unidentified "John Doe" defendants, describing them here as "other as-yet-unidentified defendant City employees who might have been present, or directed actions at, the scene of [Stoytchev's] encounters with [the] YPD . . . ." *Id.* ¶ 25.

### B. Background Allegations

The FAC contains allegations regarding an investigation of the YPD by the United States Department of Justice ("DOJ"), which began in 2007; in 2009, the DOJ notified the City of deficiencies involving the YPD's use-of-force policies, training, complaint investigations,

---

[3] In paragraph 51 of the original Complaint, Stoytchev also vaguely asserted that "[t]he City failed to implement policies and training that it knew were required to mitigate risk of harm to people who interact with YPD officers."

[4] Officer Kusick's name had been misspelled "Kusik" in the original Complaint.

supervision, and officer performance evaluations. *Id.* ¶¶ 31-34. The DOJ specifically recommended policies and training on de-escalation techniques for encounters involving people experiencing mental illness or the effects of drugs or alcohol. *Id.* ¶ 33. In 2016, the City entered into a settlement agreement with the DOJ concerning excessive force and improper stop-and-search practices. *Id.* ¶ 36. The settlement agreement was terminated on December 3, 2024. *Id.* ¶ 37.

**C. Encounters Between Stoytchev and YPD Officers Prior to October 18-19, 2019**

Yonkers police officers had interacted with Stoytchev repeatedly before the five 2019 incidents detailed in the FAC, and the YPD involuntarily committed him to St. Joseph's Medical Center for psychiatric evaluation on September 19, 2018. *Id.* ¶¶ 42-46. Stoytchev alleges that by this date, the YPD knew that he was an emotionally disturbed person, or "EDP." *Id.* ¶ 45.

With respect to the July 29, 2019 incident, the FAC identifies Officers Doyle and Lane as two of the officers who stopped Stoytchev, forced him back to his friend's vehicle, and searched the vehicle. *Id.* ¶¶ 47-48. Stoytchev alleges that after he denied possessing the drugs found inside the vehicle and declined a "breath test" because he had not been driving, the officers grabbed him, used holds known to inflict pain, threw him to the ground, and forcibly restrained him. *Id.* ¶ 48. According to Stoytchev, he was arrested, transported to Central Booking, and charged with drug possession, driving while ability impaired, and refusing to submit to a breath test. *Id.* ¶ 49. The charges were later dismissed. *Id.* ¶ 50.

With respect to the August 10, 2019 incident, the FAC identifies Officers Berni and Vieira as two of the officers who encountered Stoytchev as he approached his friend's vehicle, which was being searched. *Id.* ¶¶ 51-53. Stoytchev alleges that even though he did not resist, Officers Berni, Vieira, and other officers bent him over the hood of the car, kicked his legs, and

applied handcuffs too tightly. *Id.* ¶ 53. The officers allegedly refused to loosen the handcuffs even after Stoytchev complained, and they then proceeded to transport him to Central Booking. *Id.* ¶¶ 53-54. He was charged with three counts of drug possession; these charges were all later dismissed, but on January 30, 2020, Stoytchev pled guilty to one count of violating the VTL. *Id.* ¶ 55.

With respect to the August 25, 2019 incident, the FAC identifies Officer Macias as one of the arresting officers. *Id.* ¶ 56. Stoytchev alleges that while he was being arrested, Officer Macias and other officers pushed him to the ground, kicked him in the ribs, and unnecessarily cuffed and shackled his arms and feet. *Id.* The charge against him for possession of stolen property was later dismissed. *Id.*

With respect to the September 22, 2019 incident, the FAC identifies Officers Reagan, Kusick, and other Fourth Precinct officers as the responding officers. *Id.* ¶¶ 57-59. Stoytchev alleges that the responding officers were aware of his mental health history at the time of the incident—they encountered him visibly agitated and behaving irrationally, identified him as an EDP in need of psychiatric evaluation, and initially handcuffed him without incident after approaching calmly. *Id.* ¶¶ 59-62. Stoytchev alleges that after he was placed in the back of a patrol car, the officers would not let him out to use the restroom, and they claimed that they observed him kicking the rear side window of the vehicle. *Id.* ¶ 63. In response, officers, including Officer Kusick, failed to de-escalate the situation and used excessive force to restrain Stoytchev, including applying control holds to his upper torso and forehead. *Id.* Officers then allegedly forcibly removed him from the vehicle, slammed him to the ground, and "hog tied" his arms and legs, making it difficult for him to breathe. *Id.* Stoytchev was then transported by ambulance to St. Joseph's Medical Center for psychiatric evaluation. *Id.* ¶ 64.

**D. The October 18-19, 2019 Incident**

As for the October 18-19, 2019 incident, Stoytchev alleges in the FAC that around 11:00 p.m. on October 18, 2019, he and his girlfriend engaged in a shouting argument while at the Schlobohm Houses, which prompted security guards to call the YPD. *Id.* ¶ 67. When Stoytchev first encountered the officers, he complied with their commands, was handcuffed without incident, and was transported to St. Joseph's Medical Center for psychiatric evaluation without being charged with a crime. *Id.* ¶ 69. After he was discharged from the hospital in the early morning hours of October 19, Stoytchev returned to the Schlobohm Houses to attempt to retrieve his keys, phone, and wallet from his girlfriend's car, and asked the security guards for assistance. *Id.* ¶¶ 70-72. A security guard called 911 after Stoytchev asked for the police to be called to help him; the guard allegedly told police that Stoytchev needed help and was behaving "crazy," explained that he was unarmed, and requested an ambulance. *Id.* ¶ 72. According to the FAC, neither the dispatcher nor other YPD supervisors relayed any information to the responding officers about any mental health issues, and also failed to communicate that Stoytchev had complied with YPD commands and submitted to handcuffs just hours earlier. *Id.* ¶¶ 74-75.

The FAC identifies Officers Nieves, Ball, Doyle, and Windisch as among the first officers to arrive. *Id.* ¶ 75. Stoytchev alleges that although the YPD knew he was an EDP and had complied with officers at the same location earlier that night, the officers rushed toward him and yelled at him to get on the ground, rather than approaching slowly or using de-escalation techniques. *Id.* ¶¶ 73-76. Stoytchev asserts that he raised his hands and knelt in surrender, but the officers "swarmed" him and dragged him to the ground. *Id.* ¶ 76. He alleges that Officer Nieves repeatedly struck him in the head and shoulder, and other officers handcuffed him,

shackled his legs, and placed a knee on his neck, making it difficult for him to breathe. *Id.* ¶¶ 76-77.

As set forth in the FAC, security guard Kennedy Frempong ("Frempong") was recording the encounter on his cellphone because he believed the officers were using excessive force. *Id.* ¶ 78. Officer Nieves approached Frempong, demanded the cellphone, and deleted the video recording. *Id.* After Officer Nieves prevented Frempong from continuing to record the incident, one or more officers kicked Stoytchev while he remained handcuffed, shackled, and prone on the ground. *Id.* ¶ 79. One kick struck the back of his head, causing lacerations and the loss of four teeth. *Id.* After this most severe kick, Stoytchev heard another officer ask, "Hey Doyle, why did you do that?" *Id.* ¶ 80. Stoytchev was then transported to St. Joseph's Medical Center again for treatment of his injuries. *Id.* ¶ 81.

The four officers who arrived first on the scene—Officers Nieves, Ball, Doyle, and Windisch—subsequently completed use-of-force forms classifying the force used at the lowest reportable level. *Id.* ¶ 83. Their forms contained substantially similar language; Officer Nieves stated that he had intended to strike Stoytchev in the shoulder, but because Stoytchev kept moving, Officer Nieves accidentally hit his head. *Id.* ¶¶ 84-85. The YPD's use-of-force review remained largely inactive until December 2019. *Id.* ¶ 86.

### E. The Aftermath of the October 19, 2019 Incident: Criminal Charges and Internal Investigations

Following the October 19, 2019 incident, Officer Doyle filed a criminal complaint charging Stoytchev with three counts of felony assault on police officers. *Id.* ¶ 87. The Westchester County District Attorney's Office ("WCDAO") investigated the case, and after prosecutors conducted witness interviews, reviewed the medical records of YPD officers, and interviewed Frempong and learned that Officer Nieves had deleted the cellphone video, the

WCDAO declined to present the felony charges to a grand jury. *Id.* ¶¶ 87-88. On December 4, 2019, the WCDAO reported to the YPD Frempong's complaint that Officer Nieves had deleted his cellphone video. *Id.* ¶ 87. After the WCDAO refused to pursue the felony charges, Officer Doyle filed misdemeanor charges of trespass and resisting arrest. *Id.* ¶ 88. The trespass charge relied on an "owner's deposition form" signed by Frempong, claiming that Frempong declared Stoytchev's presence at the Schlobohm Houses to be trespassing. *Id.* ¶ 89. According to the FAC, however, Frempong was led to believe by Officer Doyle that the form he signed was merely to document his role as a witness—he did not intend to state that Stoytchev was trespassing. *Id.* ¶ 89.

The YPD conducted Internal Affairs Division ("IAD") and use-of-force investigations into the October 19, 2019 incident. *Id.* ¶¶ 90-91. None of the investigators interviewed Stoytchev or the responding emergency medical personnel, and both investigations ultimately approved the officers' use of force. *Id.* ¶¶ 91-92. The YPD allegedly failed to obtain the clearest available security-camera recordings from the Schlobohm Houses before they were destroyed pursuant to the property's standard retention protocols. *Id.* ¶¶ 93-94. The IAD concluded that Officer Nieves had improperly seized Frempong's cellphone, but classified the deletion allegation as "unsubstantiated"; although the IAD investigator and his supervisor recommended discipline, the YPD Commissioner imposed no discipline. *Id.* ¶¶ 95-98.

**F. Allegations of Municipal Liability**

The FAC then includes allegations of municipal liability against the City. These allegations particularly relate to the YPD's system for reviewing police officer uses of excessive force in their interactions with EDPs, including Stoytchev, as well as the YPD's failure to train police officers and dispatchers on proper techniques for dealing with EDPs. *Id.* ¶¶ 99-126.

### G. Causes of Action

The FAC contains eleven causes of action based on the foregoing allegations—the proposed pleading drops the state law claims from the original Complaint, expands upon Stoytchev's prior claims, and adds several new claims. Counts I through V are separate excessive force and failure to intervene claims pursuant to 42 U.S.C. § 1983 for each of the five incidents, including claims against certain newly named defendants who were not specifically identified in the original Complaint. *Id.* ¶¶ 127-57. Count VI consists of a claim for fabrication of evidence / denial of the right to a fair trial, and Count VII is a claim for malicious prosecution; both of these claims are asserted pursuant to 42 U.S.C. § 1983 against Officer Doyle arising from the October 19, 2019 charges. *Id.* ¶¶ 158-66. Count VIII is a claim asserted against Officer Nieves individually, and against the City under a theory of municipal liability, pursuant to 42 U.S.C. § 1983, for a violation of First Amendment protections for free speech and access to courts, based on the seizure and deletion of Frempong's cellphone video recording and the City's policy governing the recording of police activity. *Id.* ¶¶ 167-78. Counts IX and X are claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, against the City based on the YPD's failure to reasonably accommodate Stoytchev's disability during his encounters with officers. *Id.* ¶¶ 179-91. Count XI is styled as a "*Monell* Claim"—*i.e.*, a municipal liability claim pursuant to 42 U.S.C. § 1983 based on the Supreme Court's decision in *Monell v. Department of Social Services,* 436 U.S. 658 (1978)—based on the City's policies and practices concerning encounters between City and YPD personnel and EDPs, including, among other things, failures to provide training or to implement proper de-escalation protocols. *Id.* ¶¶ 192-97.

## III. Procedural History

The defendants named in the original Complaint filed an answer on December 12, 2022, and the Honorable Nelson S. Román entered a scheduling order on April 21, 2023. *See* ECF Nos. 5, 10. The parties in the case at that time consented to proceed before the undersigned for all purposes on May 2, 2023 pursuant to 28 U.S.C. § 636(c). ECF No. 12.

After the parties conducted discovery and attempted to resolve the case at a settlement conference, Defendants' counsel filed a letter on December 14, 2023, informing the Court that the case was ready for trial. ECF No. 24. In his own letter, also dated December 14, 2023, Stoytchev stated that there were several items that he still wanted to receive in discovery, but that once they were provided, he also wanted the matter to be "immediately" scheduled for trial. ECF No. 26.

In response to orders from the Court, *see* ECF Nos. 25, 27, Stoytchev submitted a letter on January 19, 2024, confirming that he was willing to stipulate to the dismissal of his claims arising from incidents on August 20, 2018 and September 27, 2018 since those claims were time-barred, and requesting that the Court attempt to find him *pro bono* counsel for purposes of trial, ECF No. 28; *see also* ECF No. 35 (stipulation "so ordered" by the Court). At a conference on February 5, 2024, the Court ordered Defendants to make a supplemental document production to address Stoytchev's outstanding requests by March 21, 2024. Docket Sheet, Minute Entry dated 2/5/2024.

After the Court granted both Stoytchev's application to proceed *in forma pauperis* and his motion for the appointment of *pro bono* counsel, ECF Nos. 36, 37, *pro bono* counsel

appeared in the action on his behalf on April 12, 2024. ECF Nos. 38-40.[5] The Court held a status conference on April 30, 2024. At that conference, the Court provided an explanation of the discovery that had taken place to date and the limited universe of what the Court understood to be remaining—in particular, further discovery from Defendants regarding the July, August, and September 2019 incidents and a further deposition of Stoytchev regarding these incidents. *See* ECF No. 44 at 3-4. The Court also stated that it expected that once *pro bono* counsel appeared in the case, there would be "some additional discovery," although "not voluminous additional discovery," "but some additional discovery on behalf of Mr. Stoytchev in part because he didn't have the resources or the wherewithal to conduct depositions of any of the defendants"; the Court added that "there might be some interest in supplemental document demands or interrogatories to make sure that any relevant materials have been produced." *Id.* at 4-5. At that time, Stoytchev's counsel agreed, stating that they thought that "plaintiff would benefit from having some depositions conducted on his behalf and . . . perhaps additional documentary discovery or interrogatories, things of that nature would be helpful for [them] to prepare for those

---

[5] Court filings revealed that prior to the appearance of *pro bono* counsel, another attorney had been assisting Stoytchev in this matter, though she never filed a notice of appearance. Among other things, this attorney apparently appeared at Stoytchev's deposition, and was involved in discussions with Defendants' original counsel about issues regarding the applicability of the statute of limitations for certain allegations. *See* ECF No. 17. The Court issued multiple orders in an effort to ascertain whether this attorney would formally appear on Stoytchev's behalf, *see* ECF Nos. 18, 20, but she never did.

This case therefore does not present the typical situation involving the degree of deference and accommodation owed to a *pro se* litigant, and the Court has taken this into account in its reading of the allegations in the original Complaint and its consideration of the timeliness of the proposed amendments. *See Colon v. Monroe Cnty. Bd. of Elections*, No. 20-cv-6465 (EAW), 2021 WL 1139854, at *3 (W.D.N.Y. Mar. 25, 2021) ("[W]here a *pro se* party actually received the assistance of counsel, allowing that party to have the benefit of the liberal pleadings standard of *pro se* parties when he had the assistance of counsel, would be fundamentally unfair." (quotation marks omitted)) (citing cases).

depositions." *Id.* at 6. Since Stoytchev's counsel needed time to review the discovery that had already been produced, the Court set a date of May 21, 2024, for Stoytchev's counsel to serve any additional document requests. *Id.* at 10-11. But the Court pointed out that it expected that the "additional demands can be properly tailored"; that counsel would not have to make "50 separate demands for things that [they] already have or just to confirm that [they] have the things that [they] already have"; and that counsel "can probably be much more focused about [their] approach here given the materials that [they] already have in [their] possession." *Id.* at 9. The Court envisioned that the additional discovery could be completed by the end of the summer of 2024. *Id.* at 13.

The Court held a discovery conference on July 26, 2024. In discussing the proper scope, including temporal scope, of any discovery in connection with Stoytchev's *Monell* allegations, the Court noted that the parties should "think about what's most efficient and what really is necessary to prove the claims in this case because . . . this case is going to be mostly about Mr. Stoytchev's testimony, and the testimony of the officers, and the testimony of any other non-party witnesses who may have observed some or all of the incidents in question." ECF No. 56 at 48. The next conference was held on November 1, 2024, for the Court to address the parties' outstanding discovery disputes. At that time, the Court said to Stoytchev's counsel that it wanted to know "what else that you want to do, because, again . . . there's always been an understanding that when *pro bono* counsel came into this case, there would be discovery, but we're not going to do this forever. We want to get to a point where this case is going to get teed up for trial, or settlement if that's in the offing . . . ." ECF No. 77 at 24. Noting that depositions had not yet been taken, the Court asked Stoytchev's counsel, "Is there anything else that you want to do to pursue discovery other than take depositions," adding that the Court wanted to "get us to a point

where you can have a schedule and we can take the depositions and we can move forward." *Id.* at 26. After addressing the outstanding document discovery related to the claims against the individual officers, the Court addressed the question of the scope of *Monell* discovery that would be permitted, and ruled that it would be limited to a five-year look-back period, with the parties to further meet and confer "about what exactly that should entail and how it can be done in a way that's both efficient and tailored to the needs of the case." *Id.* at 57. The Court stated that it wanted, "by early to mid December [2024][,] a firm schedule for getting to the end of discovery here . . . ." *Id.* at 65.

Following the grant of further extensions of time, and the submission of updates regarding the parties' progress with the discovery schedule that was approved by the Court, *see* ECF No. 69, and then modified with the Court's approval, *see, e.g.*, ECF Nos. 83, 85, 87, the Court conducted another discovery conference on June 23, 2025. The Court noted that at that point, it had been 14 months since *pro bono* counsel first appeared in the case, at a time when discovery was considered to have been largely completed, and that the Court had "been very accommodating as each successive status update ha[d] come in and asked for more and more time, even as [it] saw that the scope of discovery seemed to be continually expanding." ECF No. 106 at 3-4. At that conference, the Court rejected Stoytchev's counsel's expansive deposition scheduling proposal and directed the parties to come up with a schedule for taking the remaining fact depositions so that all fact depositions would be completed by September 30, 2025. *Id.* at 4-6, 28-29; *see* ECF No. 93.

During the June 23, 2025 conference, Stoytchev's counsel raised the issue of seeking leave to amend the original Complaint, and the Court set a briefing schedule for the motion. *See* ECF No. 106 at 38-39, 42. Following the resolution of still more discovery disputes at

conferences held on July 28, 2025 and September 12, 2025, the departure from the case of Defendants' second attorney, and the appearance of a third attorney on Defendants' behalf, the motion for leave to amend was ultimately filed on October 9, 2025, ECF Nos. 116-17; Defendants' opposition was filed on November 21, 2025, ECF Nos. 123-24; Stoytchev's reply papers were filed on December 30, 2025, ECF Nos. 127-29; and Defendants' sur-reply was filed on January 23, 2026, ECF No. 134.

Prior to the filing of the motion for leave to amend, the Court issued an order holding in abeyance the deadlines for serving requests for admissions, the completion of fact depositions, and the overall deadline for the completion of fact discovery. ECF No. 110. The Court reiterated at a status conference held on November 24, 2025 that fact discovery would be held in abeyance pending resolution of motion.

## DISCUSSION

### I. Legal Standard Governing Amendment of Pleadings[6]

Rule 15 of the Federal Rules of Civil Procedure provides that a party may amend its pleading with leave of the Court, and that the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quotation marks omitted). In addition, "[l]eave to amend may be denied if the proposed amendment would be futile." *Chunn v. Amtrak*,

[6] The Court does not address the parties' arguments concerning whether Stoytchev's motion satisfies the standard set forth in Rule 16 of the Federal Rules of Civil Procedure. Over the course of the litigation, the Court has granted the parties' requested extensions of time for discovery and set the briefing schedule for the instant motion for leave to amend. While the Court did not make explicit findings of good cause for these modifications to the original Civil Case Discovery Plan and Scheduling Order, *see* ECF No. 10, it did not find good cause to be lacking at the time that it granted these modifications, and it declines to do so now.

916 F.3d 204, 208 (2d Cir. 2019). "The party opposing the amendment has the burden of establishing its futility." *Szlosek v. New York State Off. of Att'y Gen.*, No. 24-cv-897 (ER), 2025 WL 1755011, at *4 (S.D.N.Y. June 25, 2025). "Amendment to a pleading is futile if it could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Long v. Parry*, 679 F. App'x 60, 63 (2d Cir. 2017) (summary order).

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all well-pleaded factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020). In the context of a proposed amended pleading, the court must accept as true the well-pleaded factual allegations in the proposed amended complaint. *See, e.g.*, *C.C.M.S. v. Oxford Realty & Holdings LLC*, No. 20-cv-3429 (NRB), 2021 WL 2941827, at *3 (S.D.N.Y. July 12, 2021) ("[T]he Court accepts as true all factual allegations in the proposed amended complaint and draws all reasonable inferences in favor of the non-moving party." (cleaned up)). The court must also "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (*en banc*). That said, a court is not required to accept legal conclusions set forth in a complaint as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Rather, to survive a motion to dismiss, a complaint must set forth sufficient facts "to state a claim to relief that is plausible on its face." *Id.* (cleaned up). A claim is facially plausible when the complaint contains enough facts to allow the court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* Put another way, a plaintiff must set forth enough facts to "nudge [his or her] claims across the line from conceivable to plausible."

*Twombly*, 550 U.S. at 570. "Although allegations that are conclusory are not entitled to be assumed true, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Lynch*, 952 F.3d at 75 (cleaned up). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

Additionally, amendment of a complaint "would likely be futile if, for example, the claims the plaintiff sought to add would be barred by the applicable statute of limitations." *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000); *see Holliday v. C.O. Artist*, No. 23-cv-2410 (PMH), 2024 WL 2882938, at *4 (S.D.N.Y. June 7, 2024) ("Courts have denied leave to amend as futile where the claims are barred by applicable statute of limitations." (quotation marks omitted)). "Where the dates in a complaint show that an action is barred by a statute of limitations, a motion to dismiss based on the statute of limitations is properly treated as one under Rule 12(b)(6) . . . ." *Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021) (cleaned up); *see Friedman v. Bartell*, No. 24-756-cv, 2025 WL 1681607, at *1 (2d Cir. June 16, 2025) (summary order) ("Dismissal on statute-of-limitations grounds is appropriate at the pleading stage if the complaint clearly shows the claim is out of time." (cleaned up)). "The date of the filing of the motion to amend is the date the action was commenced for statute of limitations purposes since the defendant is on notice of the new claims as of the filing of the motion." *Lekic v. 222 East 8th Street*, No. 11-cv-1242 (ARR) (MDG), 2012 WL 4447625, at *4 (E.D.N.Y. Sept. 25, 2012) (cleaned up). This is also the case when a plaintiff seeks leave to amend to add new defendants. *See Corrado v. New York Unified Court Sys.*, 163 F. Supp. 3d 1, 19 (E.D.N.Y. 2016)

("In the Second Circuit, when a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." (cleaned up)), *aff'd*, 698 F. App'x 36 (2d Cir. 2017) (summary order).[7]

Where a party seeks to add a claim that would otherwise be time-barred, Rule 15(c) of the Federal Rules of Civil Procedure allows for a proposed amendment to relate back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back," or "the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(A) and (B).[8] "Under Rule 15, the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (quotation marks omitted). "Where the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." *Id.* "In contrast, even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an entirely distinct set of factual allegations will not relate back." *Id.* (quotation marks omitted).

[7] Since Stoytchev's motion for leave to amend the original Complaint was filed on October 9, 2025, that is the date from which the timeliness of his proposed amendments must be determined.

[8] Rule 15(c)(1)(C) provides another mechanism for an amended pleading to relate back to the original pleading. This provision is addressed further in Section IV.B, *infra*.

## II. Proposed Amendment to Expand the Allegations Regarding the July 29, 2019, August 10, 2019, and August 25, 2019 Incidents to Include Claims of Excessive Force and Failure to Intervene (Counts I, II, and III of the FAC)

As set forth in Background Section II.G, *supra*, the Proposed First Amended Complaint seeks to assert separate causes of action for excessive force and failure to intervene for each of the five 2019 incident dates that were mentioned in the original Complaint. Defendants take issue with the proposed causes of action in Counts I, II, and III of the FAC, which relate to Stoytchev's encounters with YPD officers on July 29, 2019, August 10, 2019, and August 25, 2019. Defendants argue that amendment of the original Complaint to add these claims should be denied because the claims are time-barred and do not relate back to the original Complaint. *See* ECF No. 123 ("Opp'n Mem.") at 15-17.

With respect to claims brought pursuant to 42 U.S.C. § 1983, the statute of limitations is borrowed from the forum state's "general or residual statute [of limitations] for personal injury actions." *See Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Under New York law, the limitations period for unspecified personal injury claims is three years. N.Y. C.P.L.R. ("CPLR") § 214(5). Thus, a three-year statute of limitations applies to Section 1983 claims asserted in actions arising in New York. *See Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995); *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) ("New York's three-year statute of limitations for unspecified personal injury actions, [CPLR] § 214(5), governs section 1983 actions in New York.").

Here, the three-year statute of limitations applicable to the claims arising under Section 1983 asserted in Counts I, II, and III of the FAC began to run on the dates of each of the incidents in question, *i.e.*, July 29, 2019, August 10, 2019, and August 25, 2019. *See Garland v. City of New York*, No. 22-cv-10947 (LTS), 2023 WL 2898625, at *5 (S.D.N.Y. Apr. 10, 2023)

("A claim for excessive force under Section 1983 accrues when the excessive force was used. In addition, a claim for failure to intervene under Section 1983 that is associated with an official's use of excessive force accrues on the date of the excessive force." (cleaned up)). The limitations periods applicable to these incidents were tolled for 228 days due to the COVID-19 pandemic. *See Rich v. New York*, No. 21-cv-3835 (AT), 2022 WL 992885, at *8 (S.D.N.Y. Mar. 31, 2022) ("[C]ourts in this district have uniformly concluded that [New York State] Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims."); *see also* 9 N.Y. Comp. Codes R. & Regs. 8.202.8 (Executive Order issued on March 20, 2020, tolling statute of limitations in New York due to COVID-19 pandemic); 9 N.Y. Comp. Codes R. & Regs. 8.202.67 (Executive Order issued on October 4, 2020, ending tolling of statute of limitations on November 3, 2020). Accordingly, the limitations periods with respect to these three claims expired on March 14, 2023, March 26, 2023 and April 10, 2023, respectively. Stoytchev therefore cannot amend the original Complaint to add these claims for excessive force and failure to intervene unless they satisfy the requirements for relation back under Rule 15(c)(1)(B).[9]

While a single cause of action for excessive force and failure to intervene was included as Count I of the original Complaint, the paragraphs comprising this claim did not specify the dates that Stoytchev allegedly experienced excessive force at the hands of YPD officers. *See* Compl. ¶¶ 43-48. Even though Stoychev, in boilerplate fashion, repeated and realleged all of the

[9] "Rule 15(c)(1)(A) requires the Court to determine if New York State law provides a more forgiving principle of relation back than the federal relation back doctrine under Rule 15(c)(1)(B). New York's relation back statute is [CPLR] Section 203 (when, as here, relation back does not concern replacing John Doe defendants), but that New York rule need not be analyzed separately given its similarity to Rule 15(c)(1)(B)." *Adeleke v. Suffolk Cnty. Police Dep't*, No. 21-cv-3681 (GRB) (LGD), 2023 WL 11844273, at *6 n. 6 (E.D.N.Y. Feb. 8, 2023) (cleaned up). The Court therefore analyzes relation back here solely under Rule 15(c)(1)(B).

paragraphs in the original Complaint as part of the first cause of action, *id.* ¶ 43, it was not clear whether Stoytchev was alleging that he had been subjected to excessive force on each of the dates discussed in the original Complaint.

As set forth in Background Section I, *supra*, Stoytchev alleged in the original Complaint that on July 29, 2019, he was a passenger in a friend's vehicle which was parked at a particular location in Yonkers. Compl. ¶ 17. According to Stoytchev, after he exited the vehicle to meet someone, several YPD officers approached him, stopped him, and forced him back toward the vehicle. *Id.* After the officers searched the vehicle and found controlled substances, and after Stoytchev disputed ownership of the drugs and refused to submit to a "breath test," the officers allegedly "threw him to the ground" and arrested him. *Id.* ¶ 18. The charges stemming from this incident were later dismissed. *Id.* As for August 10, 2019, Stoytchev alleged in the original Complaint that on that date he was driven by a friend to 3 Schroeder Street in Yonkers to pick up his girlfriend, *id.* ¶ 20, and when he returned to the vehicle, he discovered that multiple Yonkers police vehicles had surrounded it and that at least eight officers were searching the car, *id.* ¶¶ 21-22. He further alleged that as he approached, officers bent him over the hood of the vehicle, handcuffed him, and arrested him for possession of a controlled substance, and that these charges were later dropped. *Id.* ¶ 22. With respect to August 25, 2019, Stoytchev alleged in the original Complaint that he was using his girlfriend's vehicle with her permission, but later in the day, his girlfriend, while intoxicated, reported the vehicle stolen. *Id.* ¶ 19. He further alleged that police officers arrested him for possession of stolen property at his place of business. *Id.* The vehicle was impounded and later sold at auction, and the criminal charges were ultimately dismissed. *Id.*

In determining whether a proposed claim in an amended complaint relates back to the date of the original complaint, a court "must inquire whether adequate notice has been given to

the opposing party by the general fact situation alleged in the original pleading." *Lederman v. Giuliani*, No. 98-cv-2024 (LMM), 2002 WL 31357810, at *2 (S.D.N.Y. Oct. 17, 2002) (quotation marks omitted); *see Slayton*, 460 F.3d at 228. "An amendment will not relate back if it sets forth a new set of operational facts; it can only make more specific what has already been alleged." *Lederman*, 2002 WL 31357810, at *2 (quotation marks omitted).

For the two August 2019 incidents, the Court noted as early as the July 26, 2024 conference that the allegations in the original Complaint did not include the use of excessive force:

> By my reading, the two incidents in August of 2019 didn't actually include any allegations of force.[[10]] They had to do with searches. I mean, in one instance Mr. Stoytchev alleges that he was bent over the hood of a car, police car, in the course of being arrested; but since he does carefully use language in other instances where he claims that he was tackled to the ground, thrown to the ground, forced to the floor, hog-cuffed. You know, I think him saying simply he was bent over the hood of the car, it doesn't say that he was slammed into the hood of the car or that he was—you could choose a different verb if he were trying to make clear that that was an allegation of a use of force. I don't read it that way.

ECF No. 56 at 38-39. The Court's assessment of these allegations is no different today. For the August 10, 2019 incident, Stoytchev alleged that he was "bent over the hood of the vehicle and handcuffed" by officers, but nothing more; only now, in the Proposed First Amended Complaint, does he allege that officers also kicked his legs and applied the handcuffs too tightly, even though that information was within Stoytchev's own knowledge at the time he filed the original

[10] There is no question that the original Complaint included allegations of excessive force in connection with some of Stoytchev's interactions with YPD officers. But the original Complaint also alleged that between August 2018 and October 2019, Stoytchev had been the subject of a "pattern of harassment" by YPD officers, which included both the use force and "false arrest." Compl. ¶ 14. Thus, within the framework of the original Complaint, it was not apparent that Stoytchev was alleging that he had experienced excessive force at the hands of YPD officers on all five dates described in the pleading.

Complaint. *Compare* Compl. ¶¶ 20-22 *with* FAC ¶ 53. For the August 25, 2019 incident, there is no reference in the original Complaint to any use force whatsoever—the original Complaint alleges only that Stoytchev was arrested, without further description of the conduct of the officers at the time of the arrest, and certainly without any of the vivid allegations added in the FAC. *Compare* Compl. ¶ 19 *with* FAC ¶ 56. The allegations in the original Complaint for the two August 2019 incidents did not provide notice that Stoytchev was claiming that he was subjected to excessive force (and failure to intervene to prevent the use of excessive force) by YPD officers on those dates, as opposed to complaining about a perceived "pattern of harassment" and "false arrest." And it makes no difference that the newly alleged facts relate to interactions that allegedly occurred on the same dates as those alleged in the original Complaint, because "[t]he relation back test . . . is not one of temporal proximity but rather of adequate notice to defendants." *Griffith v. Sadri*, No. 07-cv-4824 (BMC) (LB), 2009 WL 2524961, at *4 (E.D.N.Y. Aug. 14, 2009); *see also id.* ("Thus, it is of no moment that the arrest complained of in the original complaint occurred at the same time as the newly alleged excessive force . . . . The operational facts set forth in the original complaint assert an illegal arrest and prosecution for lack of probable cause. There is not the slightest intimation that the arrest was conducted with excessive force." (citation omitted)); *Fleming v. Dep't of Justice*, No. 90-cv-0896 (CPS), 1993 WL 16117, at *2 (E.D.N.Y. Jan. 20, 1993) ("Although all of the new claims in the proffered amendment allege facts that occurred on the same days as the alleged facts made in the original complaint, there is no 'factual nexus' between the new claims of false arrest, excessive force and assault and the original claims of illegal searches."). Accordingly, the time-barred allegations regarding the two August 2019 incidents do not relate back to the date of the original Complaint,

and Stoytchev cannot pursue distinct claims for violations of his Fourth Amendment right to be free from the excessive use of force for these interactions with the YPD.

In contrast, the allegations in the original Complaint regarding the July 29, 2019 incident do provide sufficient notice that Stoytchev was raising a claim for excessive force (and failure to intervene to prevent the use of excessive force) based on his interactions with YPD officers. Specifically, Stoytchev's allegation that he was "thrown to the ground" by unidentified YPD officers, Compl. ¶ 18, sufficed to provide notice that he was alleging the use of excessive force related to that incident. While this allegation may not have been detailed, it was enough to make clear that Stoytchev believed he had been subjected to excessive force by YPD officers on July 29, 2019.[11]

* * * * * * * * * *

For all of these reasons, Stoytchev's motion for leave to amend with respect to Count I of the FAC is GRANTED, and his motion for leave to amend with respect to Count II and Count III of the FAC is DENIED.

---

[11] Defendants confuse whether or not the allegations in the original Complaint stated a claim of excessive force with whether or not those allegations provided sufficient notice such that Stoytchev can amend the original Complaint to add an excessive force claim. *See* Opp'n Mem. at 15-16 ("The allegation that Plaintiff was 'thrown to the ground and arrested,' (ECF No. 1 ¶ 18), is not objectively sufficiently serious to be actionable as an excessive force claim. Accordingly, the allegations in Plaintiff's original Complaint are insufficient to put defendants on notice of an excessive force claim related to the July 29, 2019 arrest."). But where a party seeks leave to amend his or her complaint, and the allegations in the original pleading are sufficient to provide notice for purposes of Rule 15(c)(1)(B), the question as to whether the conduct alleged is sufficiently serious as to be actionable under a Rule 12(b)(6) standard must consider the allegations in the proposed amended pleading, not the allegations in the original pleading. *See In re Allou Distribs., Inc.*, 387 B.R. 365, 397 (Bankr. E.D.N.Y. 2008) ("Rule 15(c) requires only that [the new claims] arise out of the same 'conduct, transaction, or occurrence . . . attempted to be set forth' in the original complaint, but those original allegations do not need to have been sufficient, on their own, to state a claim.").

In addition, given that Defendants have not opposed Stoytchev's motion for leave to amend to supplement the allegations of excessive force and failure to intervene regarding the September 22, 2019 and October 18-19, 2019 incidents (Count IV and Count V of the FAC), the motion for leave to amend with respect to these claims is GRANTED.

## III. Proposed Amendment to Add New Claims

The Proposed First Amended Complaint seeks to add six entirely new claims in Counts VI through XI. *See* Background Section II.G, *supra*. Defendants contend that Stoytchev should not be permitted to amend the original Complaint to add these claims because they are all time-barred and do not relate back to the original Complaint. *See* Opp'n Mem. at 17-25.

### A. Section 1983 Claims for Fabrication of Evidence and Malicious Prosecution against Officer Doyle (Counts VI and VII of the FAC)

In the Proposed First Amended Complaint, Stoytchev alleges that following the October 19, 2019 incident, "Doyle immediately filed a felony complaint alleging three counts of felony assault on officers"; that the WCDAO "refused to present the alleged felony charges to the grand jury to secure an indictment"; and that as a result, Officer Doyle was "forced to drop the felony charges, which were terminated in [his] favor when Doyle filed a superseding misdemeanor indictment with Yonkers City Court charging [him] with trespassing and resisting arrest." FAC ¶¶ 87-88; *see id.* ¶¶ 158-162 (Count VI). Moreover, the trespass charge relied on an "owner's deposition form" signed by Frempong, claiming that Frempong declared Stoytchev's presence at the Schlobohm Houses to be trespassing. *Id.* ¶ 89. According to the Proposed First Amended Complaint, however, Frempong was led to believe by Officer Doyle that the form he signed was merely to document his role as a witness—Frempong did not intend to state that Stoytchev was trespassing. *Id*. Stoytchev alleges that Officer Doyle "omitted the material information about Frempong's intent when submitting the fabricated owner's deposition to the WCDAO, as well as

the destruction of potentially exculpatory video evidence showing [him] in a public area and complying with officers' commands." *Id.*; *see id.* ¶¶ 163-66 (Count VII).

As explained in Discussion Section II, *supra*, a three-year statute of limitations applies to Section 1983 claims asserted in actions arising in New York. *See Pinaud*, 52 F.3d at 1156.[12] Section 1983 claims for fabrication of evidence and malicious prosecution "accrue when the underlying criminal proceedings have been resolved in the plaintiff's favor." *Adams v. Bronx Dist. Att'y's Off.*, No. 26-cv-1372 (LTS), 2026 WL 1863816, at *4 (S.D.N.Y. June 26, 2026) (citing *McDonough v. Smith*, 588 U.S. 109, 116-17 (2019)). Here, Stoytchev alleges that the felony charges against him based on the October 19, 2019 incident ended in a favorable termination when the WCDAO refused to proceed with those charges, and Doyle filed superseding misdemeanor charges instead. FAC ¶ 88. For purposes of this motion, and for determining the appropriate limitations period, the Court will assume without deciding that this constituted a "favorable termination" of these charges. The superseding misdemeanor information was filed on January 15, 2020, ECF No. 124-1, and these claims therefore accrued on that date. Taking into account the 228 days during which the statute of limitations was tolled due to the COVID-19 pandemic, *see Rich*, 2022 WL 992885, at *8, the three-year statute of limitations expired on August 31, 2023. These claims are therefore time-barred, and the original Complaint cannot be amended to add them, unless they relate back.

[12] Defendants contend that a one-year statute of limitations applies to malicious prosecution claims, *see* Opp'n Mem. at 17, but that is the limitations period for malicious prosecution claims brought under New York law, not under Section 1983, *see Brown v. Seniuk*, No. 01-cv-1248 (SJ), 2002 WL 32096576, at *3 (E.D.N.Y. Mar. 25, 2002) ("The Statute of Limitations for actions for malicious prosecution is three years under 42 U.S.C. § 1983, and one year under New York state law. McKinney's CPLR § 215."); *Murphy v. City of Elmira*, No. 18-cv-6572 (FPG), 2023 WL 5938777, at *5 (W.D.N.Y. Sept. 11, 2023) ("The statute of limitations for § 1983 malicious prosecution claims is three years."); *Hop Wah v. Vance*, No. 23-cv-1420 (LGS), 2024 WL 3598441, at *1 (S.D.N.Y. July 30, 2024).

The original Complaint, however, did not contain a single allegation regarding any actions taken by Officer Doyle after his October 19, 2019 interaction with Stoytchev involving the alleged use of excessive force, nor did it mention any prosecution of Stoytchev based on the events of October 19, 2019, or what became of the charges against him.[13] To the extent that the original Complaint alleged anything regarding the aftermath of the October 19, 2019 incident, those allegations were limited to purported deficiencies in the YPD's "system for reviewing use of force incidents and disciplining officers involved." Compl. ¶ 46; *see also id.* ¶¶ 36-39. Such allegations were part of the *Monell* claim included in the original Complaint, and did not give any indication of Stoytchev's intent to pursue causes of action for fabrication of evidence / denial of the right to a fair trial, or malicious prosecution, against Officer Doyle. These proposed causes of action in the FAC therefore do not relate back to the date of the original Complaint, as they depend upon an "entirely distinct set" of factual allegations. *See Slayton*, 460 F.3d at 228; *Lederman*, 2002 WL 31357810, at *2.

Accordingly, Stoytchev's motion for leave to amend to add the claims in Count VI and Count VII of the FAC is DENIED.

**B. Section 1983 Claim for Violation of First Amendment Rights of Freedom of Speech and Access to Courts against Officer Nieves and City of Yonkers (Count VIII of the FAC)**

The Proposed First Amended Complaint seeks to add an entirely new claim, based on entirely new allegations, for violation of Stoytchev's First Amendment rights due to the City's "First Amendment Policy," which he claims is unconstitutional both on its face, and as applied by Officer Nieves when he destroyed Frempong's cellphone video of the October 19, 2019

[13] This is in notable contrast to Stoytchev's allegations regarding other incidents in the original Complaint, *see* Compl. ¶ 18 ("The charges were later dismissed."); ¶ 19 ("The charges were later dismissed."); ¶ 22 ("Those charges were later dropped.").

incident. FAC ¶¶ 5-7, 78, 95, 168-78; Ex. C ("First Amendment Policy"). Stoytchev further contends that the City and Officer Nieves deprived him of "critical video evidence," and thus deprived him of "adequate, effective and meaningful access to courts." *Id.* ¶ 178 (quotation marks omitted).

The Second Circuit recently recognized that "the First Amendment protects the right to record law enforcement activity in public." *Massimino v. Benoit*, 188 F.4th 120, 131 (2d Cir. 2026).

The First Amendment Policy provides, in relevant part, that

> YPD members may not limit actions by onlookers or bystanders to witness, observe, record and/or comment on officer conduct, including stops, detentions, searches, arrests, or uses of force, by camera, video recorder, cell phone recorder, or other means with the following exceptions: (1) YPD members may limit individuals observing stops, detentions, arrests and other incidents from coming within 20 feet of the incident/location of police activity . . . .
>
> Absent exigent circumstances, such as the reasonable belief that immediate destruction or loss of relevant evidence is likely, officers shall not seize or otherwise coerce production of recorded sounds or images without consent or obtaining a warrant. Under no circumstances shall officers destroy such recordings or order an individual to destroy such recordings.

FAC Ex. C. The proposed First Amendment claim is described by Stoytchev as follows in his reply brief:

> [Stoytchev] is alleging: 1) YPD's First Amendment [P]olicy is unconstitutional on its face; 2) Nieves, emboldened by the unconstitutional policy, individually violated [Stoytchev's] First Amendment rights when implementing that policy; 3) the City is also liable under *Monell* for (a) the past First Amendment violation committed by Nieves, and (b) for maintaining the facially unconstitutional policy on an ongoing basis, warranting injunctive relief enjoining its further enforcement . . . . Both the City and Nieves are liable for the past violation of [Stoytchev's] First Amendment rights, and the City is liable for the ongoing maintenance of the policy.

ECF No. 127 ("Reply Mem.") at 10.[14]

### 1. Timeliness

Defendants contend that this claim is time-barred and does not relate back to the original Complaint. *See* Opp'n Mem. at 20-21. Stoytchev maintains that the First Amendment claim is timely because it "accrued in February of [2025], when [he] first became aware, in deposition, of the security guard's intent in filming the incident and that his First Amendment right to receive the video from a willing speaker had been violated." Reply Mem. at 11.

"[A] Section 1983 claim accrues when 'the alleged conduct has caused the claimant harm and the claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm.'" *Paul v. Capra*, No. 20-cv-5154 (NSR), 2022 WL 992845, at *5 (S.D.N.Y. Mar. 31, 2022) (quoting *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994)). Defendants do not contest Stoytchev's assertion regarding when he became aware of this claim. And even if the claim could be considered to have accrued at some earlier point based on discovery provided to Stoytchev's counsel, *see, e.g.*, ECF Nos. 128-2, 128-3, the "as applied," as well as the access to courts, portions of the claim would be timely whether they accrued in 2024 or in early 2025. Moreover, the aspect of the claim that presents a facial challenge to the First Amendment Policy is timely as well. One court in this District noted that "[t]he Second Circuit has not yet directly addressed whether the statute of limitations for a § 1983 claim can bar a facial challenge to legislation brought under the First Amendment, and the issue has not been resolved by other

[14] The First Amendment claim as pled in the Proposed First Amended Complaint is ambiguous and susceptible to multiple interpretations. Indeed, in his reply brief, Stoytchev pointed out that "Defendants misunderstand the First Amendment theories at issue." Reply Mem. at 10. In an effort to clarify the scope of this claim, Stoytchev provided the description of the First Amendment claim that is quoted above. The Court's analysis of this proposed claim tracks Stoytchev's own description of the claim in his reply brief.

circuit courts," but it held that "[b]ecause of the ongoing nature of the harm caused by such legislation, [and] the burden on [the plaintiff's] First Amendment rights, . . . the statute of limitations for facial challenges to legislation based on the First Amendment does not accrue until the statute is repealed or otherwise invalidated." *EklecCo NewCo LLC v. Town of Clarkstown*, No. 16-cv-6492 (NSR), 2019 WL 2210798, at *7 (S.D.N.Y. May 21, 2019); *see also Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 441-42 (E.D.N.Y. 2021); *Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, N.Y.*, No. 19-cv-443 (KMK), 2021 WL 3605041, at *6 n.10 (S.D.N.Y. Aug. 13, 2021). Since the First Amendment Policy is still in effect, this claim has yet to accrue and is thus not time-barred.

Accordingly, because no aspect of this claim is untimely, the Court addresses the merits of the claim—*i.e.*, whether amendment of the original Complaint to allow this cause of action would be futile.

**2. Right of Access**

With respect to the destruction of the cellphone video by Officer Nieves, Stoytchev's First Amendment claim is asserted in part as a denial of access to courts. *See id.* ¶ 178 ("The combined acts and omissions of Defendant City and its agents, including in particular Defendant Nieves, deprived Plaintiff of critical video evidence and, as a result, of 'adequate, effective and meaningful' access to courts.").

"Courts of Appeals have recognized two variants of right-of-access claims." *Sousa v. Marquez*, 702 F.3d 124, 127 (2d Cir. 2012) (citing *Christopher v. Harbury,* 536 U.S. 403, 413-14 (2002)). "First, plaintiffs may allege that 'systemic official action' frustrated their ability to file a suit." *Id.* "The object of this type of suit is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* (quotation marks

omitted). "Such suits are therefore labeled 'forward-looking.'" *Id.* "The second variant of right-of-access claims is 'backward-looking access claims,' covering suits that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 127-28 (cleaned up). "This may occur, for instance, if the official action caused the loss or inadequate settlement of a meritorious case." *Id.* at 128 (quotation marks omitted). "In either circumstance, however, the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* (quotation marks omitted).

Stoytchev's "right-of-access" claim, based on the destruction of the cellphone video, is a "backward-looking" access claim. But "[t]he viability of backward-looking right-of-access claims is far from clear in this Circuit . . . ." *Id.*; *see also Kern v. Contento*, No. 21-1672, 2022 WL 1112767, at *3 (2d Cir. Apr. 14, 2022) (summary order) (again declining to formally recognize the viability of a backward-looking right-of-access claim). And the Second Circuit has explained that even if such a claim were recognized, it would be available only if: (1) "the governmental action caused the plaintiff's suit to be dismissed as untimely," *Sousa*, 702 F.3d at 128, which is clearly not applicable here; or (2) "if official misconduct was so severe as to render hollow [a plaintiff's] right to seek redress," *id.* (cleaned up). This second circumstance, however, would be available "only if a judicial remedy was completely foreclosed by the . . . nondisclosure." *Id.* (cleaned up). Indeed, "when a plaintiff in a backward-looking access suit alleges that the government concealed or manipulated relevant facts, the claim may not proceed if the plaintiff was, at the time of the earlier lawsuit, aware of the facts giving rise to his [or her] claim." *Id.* As the Second Circuit explained,

> [t]hat is because a plaintiff who has knowledge of the facts giving rise to his [or her] claim and an opportunity to rebut opposing evidence *does* have adequate access to a judicial remedy. If a governmental official is lying, for instance, the plaintiff can attempt to demonstrate the falsity of the

> official's statements through discovery and argument before the court. The point of the backward-looking right of access recognized by other circuits is to ensure that plaintiffs have that opportunity—not to convert every instance of deception by a governmental witness into a separate federal lawsuit.

*Id.* at 128-29 (emphasis in original).

In this case, Stoytchev's ability to bring his claim of excessive force and failure to intervene based on the October 19, 2019 incident has not been "completely foreclosed" by the destruction of the cellphone video. He therefore cannot state a claim for violation of his First Amendment rights based on the denial of access to courts. *See Taranto v. Putnam Cnty.*, No. 21-cv-2455 (KMK), 2023 WL 6318280, at *13 (S.D.N.Y. Sept. 28, 2023) ("[E]ven assuming backward-looking access claims are actionable, [p]laintiffs' fail . . . . Plaintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed—accordingly the claim is dismissed."); *Brown v. Volpe*, No. 15-cv-9004 (PAE), 2017 WL 985895, at *4 (S.D.N.Y. Mar. 13, 2017) (First Amendment right of access claim dismissed where plaintiff alleged that defendant police officer prevented him from bringing civil suit by tampering with evidence, but did not allege that plaintiff "lacked knowledge of the facts giving rise to such a suit," nor did he allege "an absence of an opportunity . . . to rebut opposing evidence"; indeed, plaintiff filed "this very action"). Stoytchev's claim regarding the October 19, 2019 incident of course is proceeding, and he may be able to introduce evidence of the destruction of the cellphone video in support of this very claim. It is simply not accurate to say that he has been denied access to courts to pursue this claim as a result of the destruction of the video.

Accordingly, because the FAC does not and could not plead the complete foreclosure of a judicial remedy, Stoytchev's motion for leave to amend to add this claim is DENIED because the amendment would be futile.

**3. As Applied Challenge to First Amendment Policy**

Stoytchev also alleges that his First Amendment rights were violated when Officer Nieves, purportedly acting pursuant to the First Amendment Policy, seized Frempong's cellphone and deleted the video he took of the police activity on October 19, 2019, which thereby harmed Stoytchev's ability to receive such video. *See* FAC ¶¶ 6, 7, 170, 176. Elsewhere in the FAC, however, Stoytchev acknowledges that Officer Nieves was *not* acting in accordance with the policy; rather, the "IAD's investigation confirmed . . . that Nieves . . . seized Frempong's phone *in violation of* [the] YPD's First Amendment Policy." *Id.* ¶ 96 (emphasis added). Indeed, the First Amendment Policy states that

> [a]bsent exigent circumstances, such as the reasonable belief that immediate destruction or loss of relevant evidence is likely, *officers shall not seize or otherwise coerce production of recorded sounds or images without consent or obtaining a warrant. Under no circumstances shall officers destroy such recordings or order an individual to destroy such recordings*.

FAC Ex. C (emphasis added). In other words, even if, as Stoytchev alleges, Officer Nieves's purported justification for confronting Frempong was that he allegedly "was standing at 'an unsafe distance,'" FAC ¶ 95—which potentially could have implicated the exception to the First Amendment Policy that allows for limiting the actions by onlookers within a 20-foot "buffer zone"—it was *still* a violation of the First Amendment Policy for Officer Nieves to seize Frempong's cellphone and destroy the video.

Stoytchev cannot plausibly allege a violation of his First Amendment rights as a result of Officer Nieves's application of the First Amendment Policy, when the FAC concedes that

Officer Nieves violated that policy. Moreover, there can be no claim of municipal liability against the City when the First Amendment Policy was not the "moving force" behind Officer Nieves's alleged misconduct. *See Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."). Accordingly, Stoytchev's motion for leave to amend to add this claim is DENIED because the amendment would be futile.

### 4. Facial Challenge to First Amendment Policy

Stoytchev also challenges the YPD's First Amendment Policy on its face, alleging that it is a "content-based restriction," a "viewpoint-based restriction," "does not serve a compelling government interest[,] and is not narrowly tailored to protect any such interest." FAC ¶¶ 171-72. He alleges that the First Amendment Policy is "overinclusive and substantially overbroad." *Id.* ¶ 175. Stoytchev additionally alleges that the policy "burdens and chills [his] exercise of his First Amendment rights, including to act as watchdog over [the] YPD by recording them in public, as well as the rights of the public and the press which [he] has standing to assert due to the injury-in-fact he suffered from the First Amendment Policy, combined with its overbreadth." *Id.* ¶ 173. He seeks a declaration that the First Amendment Policy violates the United States Constitution and that his rights were violated, as well as an injunction against enforcement of the policy's 20-foot buffer zone, and a prohibition on "the seizure of cell phone and other video recordings of police activity." *Id.* Prayer for Relief ¶¶ (d)-(e).[15]

[15] The First Amendment Policy, quoted above in Discussion Section II.B, already prohibits the seizure of cellphone and other video recordings of police activity "[a]bsent exigent circumstances, such as the reasonable belief that immediate destruction or loss of relevant evidence is likely." *See* FAC Ex. C.

Stoytchev cannot proceed with his facial challenge to the First Amendment Policy because he lacks standing to do so.

A "party invoking federal jurisdiction bears the burden of establishing prudential and constitutional standing," and "courts may raise the issue *sua sponte* . . . ." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015) (cleaned up). "As the Second Circuit has explained, standing has two components: constitutional standing, a mandate of the case or controversy requirement in Article III of the United States Constitution, and prudential considerations of standing, which involve judicially self-imposed limits on the exercise of federal jurisdiction." *Liu v. New York City Campaign Fin. Bd.*, No. 14-cv-1687 (RJS), 2016 WL 5719773, at *3 (S.D.N.Y. Sept. 29, 2016) (cleaned up) (quoting *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. Cookson Am., Inc.*, 710 F.3d 470, 474 (2d Cir. 2013)). "A plaintiff must have Article III standing in order for the Court to have subject matter jurisdiction over its claims." *Id.* "It is hornbook law that a plaintiff must demonstrate that '(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

"The substantial overbreadth doctrine permits a plaintiff to plead a facial First Amendment challenge to a statute with no requirement that the person making the attack demonstrate that his [or her] own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Brokamp v. James*, 66 F.4th 374, 389-90 (2d Cir. 2023) (quotation marks omitted). But the overbreadth doctrine "does not absolve the plaintiff of the initial

obligation to plead the injury in fact required for standing." *Id.* at 390; *see Liu*, 2016 WL 5719773, at *5 ("[E]ven when the *prudential* rule against third-party standing does not apply, as in certain First Amendment contexts, a plaintiff still must satisfy *Article III's* requirement of injury in fact." (emphases in original) (cleaned up)). Rather, "the overbreadth doctrine speaks to whose interests a plaintiff suffering Article III injury may represent. It does not provide a reason to find personal injury where none is present or imminently threatened in the first instance." *Brokamp*, 66 F.4th at 390 (cleaned up). "Thus, the prudential standing exception in overbreadth cases 'only allows those who have suffered some cognizable injury, but whose conduct is not protected under the First Amendment, to assert the constitutional rights of others, and therefore, applies in only a narrow class of First Amendment cases.'" *Liu*, 2016 WL 5719773, at *5 (quoting *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991)).

"As the Supreme Court has instructed, 'a plaintiff must demonstrate standing separately for each form of relief sought.'" *Id.* at *4 (quoting *Laidlaw*, 528 U.S. at 185). "To obtain *prospective* relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia,* 'a sufficient likelihood that he [or she] will again be wronged in a similar way.'" *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (emphasis in original) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). "That is, a plaintiff must demonstrate a certainly impending future injury." *Id.* (quotation marks omitted). "In establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Id.*

Here, Stoytchev, who is seeking declaratory and injunctive relief, claims he has standing to assert the "rights of the public and the press" "due to the injury-in-fact he suffered from the

First Amendment policy, combined with its facial overbreadth." FAC ¶ 173. But Stoytchev does not allege in anything other than a conclusory fashion how the First Amendment Policy or, more specifically, the 20-foot "buffer zone" included in the policy, caused him or anyone else to suffer a violation of their First Amendment rights. Again, when Officer Nieves allegedly seized Frempong's cellphone and deleted the video of the October 19, 2019 incident, those actions were taken in direct violation of a provision of the First Amendment Policy that has nothing to do with the 20-foot buffer zone. Accordingly, Stoytchev has not plausibly alleged that he suffered any injury in fact from the First Amendment Policy—his injury, if any, in connection with this claim was caused by Officer Nieves's *violation* of the policy. Without this essential element of Article III standing, Stoytchev cannot assert a facial challenge to the First Amendment Policy on behalf of himself or anyone else.

As to future injury, Stoytchev only makes the vague, conclusory allegation that as a result of the First Amendment Policy, he cannot "act as a watchdog over [the] YPD by recording them in public." *Id.* But his own alleged injury was that the policy supposedly prevented him from *receiving someone else's video recording* of YPD activity, *id.* ¶¶ 6, 78, 170, 176, not that he himself was somehow prohibited from recording the YPD to monitor officer conduct. Stoytchev thus makes no plausible allegations that application of the policy in the future will lead to any First Amendment injury—let alone the kind of injury that he allegedly suffered—or that equitable relief will prevent such an injury in the future. He therefore fails to plausibly allege that he has standing to seek prospective relief on behalf of others for his challenge to the First Amendment Policy. *See Liu*, 2016 WL 5719773, at *5 ("Because [p]laintiffs here fail to plausibly allege that they will suffer *any* cognizable future injuries from enforcement of [the rule], the prudential exception for overbreadth cases is inapposite." (emphasis added)).

Because Stoytchev lacks standing to bring his facial challenge to the First Amendment Policy, his motion for leave to amend to add this claim is DENIED. The denial with respect to this claim, however, must be without prejudice. *See Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 121 (2d Cir. 2017) ("[W]hen a case is dismissed for lack of federal subject matter jurisdiction, Article III deprives federal courts of the power to dismiss the case with prejudice. As a result, where a case is dismissed for lack of Article III standing, as here, that disposition cannot be entered with prejudice, and instead must be dismissed *without prejudice*." (cleaned up) (emphasis in original)).

* * * * * *

For all of these reasons, Stoytchev's motion for leave to amend to add Count VIII—a multi-pronged Section 1983 claim for violation of his First Amendment rights—is DENIED with respect to his right of access to courts claim and his as applied challenge to the YPD's First Amendment Policy, and is DENIED WITHOUT PREJUDICE with respect to his facial challenge to the YPD's First Amendment Policy.

### C. Claims for Violations of the ADA and Rehabilitation Act against the City (Counts IX and X of the FAC)

The Proposed First Amended Complaint seeks to add claims against the City for violations of Title II of the ADA and of the Rehabilitation Act based on the alleged incidents of excessive force. FAC ¶¶ 179-85, 186-91. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA defines a "disability" as (i) "a physical or mental impairment that substantially limits one or more major life activities" of an individual; (ii) "a record of such an impairment"; or (iii) "being regarded as having such an

impairment." 42 U.S.C. § 12102. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

"To plead a violation of Title II of the ADA, a plaintiff must allege [1] that she [or he] is a qualified individual with a disability; (2) that she [or he] was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her [or his] disability." *Felix v. City of New York*, 344 F. Supp. 3d 644, 663 (S.D.N.Y. 2018) ("*Felix I*") (cleaned up) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)). "To bring a claim under the Rehabilitation Act requires essentially the same showing; 'the same factual allegations generally will support both ADA and Rehabilitation Act Claims.'" *Id.* (quoting *Fulton*, 591 F.3d at 42 n.1). "In addition, to recover under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding." *Morales v. City of New York*, No. 13-cv-7667 (RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016) (quotation marks omitted).[16] "Moreover, the law is clear that

[16] Stoytchev alleges that "[u]pon information and belief, the City and [the] YPD receive federal financial assistance . . .," FAC ¶ 30, and Defendants do not argue to the contrary in their motion papers.

municipalities may be held vicariously liable for violations of Title II of the ADA and Section 504 of the Rehabilitation Act committed by their agents." *Id.*

"As a general matter, qualified individuals under [the ADA and Rehabilitation Act] may base discrimination claims on a claim of intentional discrimination (or disparate treatment); disparate impact; or failure to make a reasonable accommodation." *Felix I*, 344 F. Supp. 3d at 663. In the FAC, Stoytchev bases his claims on a failure to make a reasonable accommodation. "A number of courts have considered whether interactions between law enforcement and disabled individuals—whether initiated by the disabled individual or the police and whether the interaction culminates in an arrest—are 'services, programs, or activities' subject to the requirement of accommodation under Title II of the ADA. Those courts have generally found that Title II applies, but the reasonableness of the accommodation required must be assessed in light of the totality of the circumstances of the particular case." *Williams v. City of New York*, 121 F. Supp. 3d 354, 365 (S.D.N.Y. 2015). Courts in this Circuit have found that "the ADA requires police departments to make reasonable accommodations for disabled suspects." *Felix v. City of New York*, No. 16-cv-5845 (AJN), 2020 WL 6048153, at *4 (S.D.N.Y. Oct. 13, 2020) ("*Felix II*") (collecting cases).

**1. Timeliness and Relation Back**

Defendants argue first that amendment of the original Complaint to add the proposed ADA and Rehabilitation Act claims should be denied because the claims are time-barred and do not relate back to the original Complaint. *See* Opp'n Mem. at 22.

"Because the ADA and Rehabilitation Act do not contain statute of limitations provisions, courts look to analogous state law to determine the applicable limitations period." *Bolden v. Westchester Cnty. N.Y. Bd. of Ethics*, No. 22-cv-10555 (LTS), 2023 WL 3976931, at

*12 (S.D.N.Y. June 12, 2023). "In New York, the State's three-year personal injury statute of limitations applies to claims brought under Title II of the ADA and the Rehabilitation Act." *Id.*; *see also Stropkay v. Garden City Union Free Sch. Dist.*, 593 F. App'x 37, 41 (2d Cir. 2014) (summary order). "Under these provisions, the claims accrue when the plaintiff knew or had reason to know of the injury giving rise to his [or her] claims." *Bolden*, 2023 WL 3976931, at *12.

With respect to the ADA claim, Stoytchev alleges in Count IX that "[t]he excessive force suffered by Plaintiff . . . was a direct and proximate result of the City's violation of Title II of the ADA." FAC ¶ 184.[17] Assuming therefore that these claims are based on each of the alleged incidents involving the YPD, the ADA and Rehabilitation Act claims accrued on each of those dates, *i.e.*, (1) July 29, 2019, (2) September 22, 2019, and (3) October 18-19, 2019.[18] Given the three-year statute of limitations applicable to ADA and Rehabilitation Act claims and the 228 days of tolling due to COVID-19, *see Rich*, 2022 WL 992885, at *8,[19] the respective limitations periods expired on (1) March 14, 2023, (2) May 8, 2023, and (3) June 3-4, 2023. These claims

[17] Counsel informed the Court at the status conference held on November 24, 2025 that this paragraph in the FAC should have included Count V, the alleged use of excessive force on October 19, 2019, and the Court analyzes this claim with respect to that date as well.

[18] The Court includes only the incidents alleged in Counts I, IV, and V since, as explained in Discussion Section II, *supra*, the motion for leave to amend is denied as to Counts II and III.

[19] Because the ADA and Rehabilitation Act, like Section 1983, borrow their statutes of limitations from New York law, *see Bolden*, 2023 WL 3976931, at *12, it follows that the state law tolling provisions should be applied to these claims as well, *see Bd. of Regents of Univ. of N.Y. v. Tomanio*, 446 U.S. 478, 485 (1980) (explaining that borrowing a state statute of limitations "logically included rules of tolling," and state tolling rules govern "except when inconsistent with the federal policy underlying the cause of action under consideration" (quotation marks omitted)); *Rich*, 2022 WL 992885, at *8 ("Federal courts are also obligated to apply New York's tolling rules." (citing *Tomanio*, 446 U.S. at 483)).

are therefore time-barred, and, to the extent they might relate back to the original Complaint, the Court finds that they only relate back to allegations regarding the October 19, 2019 incident.

In Count V of the original Complaint, which asserted a claim for common law negligence and gross negligence, Stoytchev alleged that "Defendants owed [Stoytchev] a duty of reasonable care when Defendants . . . encountered him in the early morning hours of October 19, 2019 experiencing a severe mental health crisis," Compl. ¶ 67, and that they "breached such duty of reasonable care . . . by using excessive force to restrain and arrest him and being otherwise indifferent to his suffering and safety," *id.* ¶ 68. This claim was asserted against the individual defendants, and also against the City under the doctrine of *respondeat superior*. *Id.* ¶ 70. These allegations provided notice of the essential facts underpinning the claims against the City for disability discrimination under the ADA and the Rehabilitation Act, namely, that Stoytchev was an individual whose mental health condition needed to be reasonably accommodated by YPD officers in their interaction with him on October 19, 2019.

In contrast, the original Complaint did not include any factual allegations sufficient to provide notice of ADA and Rehabilitation Act claims related to the other incidents involving the alleged use of excessive force. There was only one other vague allegation alluding to Stoytchev's mental health. In Count II of the original Complaint, which asserted a Section 1983 claim for violation of Stoytchev's Fourteenth Amendment rights, Stoytchev alleged in conclusory fashion that "Defendants and possible as-yet-unidentified defendant officers acted with deliberate indifference to George Stoytchev's objectively serious medical/mental health needs . . . [and] failed to take reasonable measures in response to Stoytchev's medical condition, which they knew or should have known posed an excessive risk to Stoytchev's health or safety." *Id.* ¶ 50. He further alleged that "[i]n the manner described more fully above, the City

maintained an official policy that was the moving force behind the violation of [his] Fourteenth Amendment rights." *Id.* ¶ 51. But there were no further allegations in the original Complaint regarding these "objectively serious" mental health needs, either in identifying what they were, or in the context of any of the use of force incidents other than the October 19, 2019 incident. There also were no further allegations regarding any of Stoytchev's medical needs, nor were there any allegations of YPD policies related to police interactions with individuals suffering from mental health conditions. Accordingly, insofar as timeliness and relation back are concerned, the original Complaint may be amended to add ADA and Rehabilitation Act claims, but only as they relate to the alleged use of excessive force on October 19, 2019. *See Slayton*, 460 F.3d at 228; *Lederman*, 2002 WL 31357810, at *2.

**2. Failure to State a Claim**

Defendants also challenge the ADA and Rehabilitation Act claims on the merits.

**a. Qualified Individual with a Disability**

First, Defendants contend that the Proposed First Amended Complaint fails to plausibly allege that Stoytchev is disabled as defined in the ADA, and therefore that allowing the original Complaint to be amended to add these claims would be futile. *See* Opp'n Mem. at 22-23. Meanwhile, in his reply brief, Stoytchev states that he has sufficiently alleged that he has a "disability" as defined in the ADA, particularly under the provision of the statute that defines a disability as "being regarded as" having an impairment. *See* 42 U.S.C. § 12102(1)(C); Reply Mem. at 12. Pursuant to the ADA, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental

impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

In the FAC, Stoytchev alleges that on October 19, 2019, "units recognized that the officers just responded to an earlier call involving [him] at the same housing complex, and announced over the radio that they just tried admitting [him] to Saint Joseph's [Medical Center]," which is "known to YPD officers as the hospital to bring someone who is suffering from a mental or behavioral crisis." FAC ¶ 74. He further alleges that "[s]ome or all of the responding officers, dispatchers, and supervisors were on notice that [he] qualified as an EDP, for reasons including the radio traffic, past interactions, computer-aided dispatch system records, and YPD . . . announcements." *Id.* Earlier allegations in the FAC relate to an interaction on September 19, 2018, when the "YPD responded to [Stoytchev's] home and involuntarily committed him to Saint Joseph's Medical Center . . . for psychiatric evaluation"; Stoytchev alleges that the "YPD knew at least by this date that [he] was an EDP." *Id.* ¶ 45. Stoytchev also alleges, in connection with the September 22, 2019 incident, that "[a]ccording to YPD incident records and officer testimony, [he] was observed to be 'screaming,' 'clearly agitated,' and 'acting irrationally,'" *id.* ¶ 59; that "[o]fficers on scene, including those with prior knowledge of [him], identified him as an EDP in need of psychiatric evaluation," *id.* ¶ 60; and that "[u]pon information and belief, YPD issued a 'be on the lookout of,' or 'BOLO,' notice on its computer-aided dispatch system at or around the time of this incident[,]" which "classified [him] as an EDP," *id.* ¶ 61. Stoytchev alleges that on the evening of October 18, 2019, "officers decided to involuntarily commit [him] for evaluation at Saint Joseph's psychiatric department," *id.* ¶ 69, and "[a]t Saint Joseph's, [he] saw a doctor who diagnosed him with Borderline Personality Disorder . . .," *id.* ¶ 70.

Under the applicable Rule 12(b)(6) standard, pursuant to which the Court must draw all inferences in favor of Stoytchev, these allegations suffice for Stoytchev to have plausibly alleged that he was a qualified individual with a disability because he was regarded as having certain mental health impairments. *See Short v. City of Rochester*, No. 22-cv-6263 (EAW), 2022 WL 17990106, at *5 (W.D.N.Y. Dec. 29, 2022) ("Here, [p]laintiffs have alleged that Jones was in visible mental distress, that he was actively engaging in self-harm, that he was begging the responding officers to shoot him, and that he had come from the Mission, which was known to the [police department] to serve individuals with mental illness. On these facts, it is a reasonable inference that the responding officers were aware of Jones'[s] mental disability.").

**b. Stoytchev Is Not Required to Plead Ill Will**

Second, Defendants contend that these claims fail because Stoytchev failed to plead that they "harbored ill will towards his alleged disability." Opp'n Mem. at 23. But a plaintiff is not required to plead personal animosity or ill will to state a claim for relief under the ADA or the Rehabilitation Act. *See Felix I*, 344 F. Supp. 3d at 664.

**c. Defendants' "Direct Threat" Argument Is Not Sufficient for the Amendment to Be Considered Futile**

Third, Defendants argue that these claims fail because Stoytchev presented a "direct threat" to the safety of others. Opp'n Mem. at 24-25. Federal regulations do "not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a). "Most often applied in the employment context, the term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." *Sage v. City of Winooski through Police Dep't*, No. 16-cv-116 (WKS), 2017 WL

1100882, at *4 (D. Vt. Mar. 22, 2017) (cleaned up) (quoting 42 U.S.C. § 12181(B)(3)).[20] "It is the defendant's burden to establish that a plaintiff poses a direct threat of harm to others." *Id.* (citing *Hargrave v. Vermont*, 430 F.3d 27, 35 (2d Cir. 2003)); s*ee Brunette v. City of Burlington, Vermont*, No. 15-cv-61 (CR), 2018 WL 4146598, at *33 (D. Vt. Aug. 30, 2018) ("The direct threat doctrine operates as an affirmative defense to a disability discrimination claim under the ADA. The party asserting a direct threat as a basis for excluding an individual bears the heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." (cleaned up)). Drawing all inferences in Stoytchev's favor, as the Court must under Rule 12(b)(6), the allegations in the Proposed First Amended Complaint "suggest a potential question of fact as to whether, and to what extent, [Stoytchev] presented a danger to the officers at the time" that the officers engaged in a violent struggle with him.[21] *Sage*, 2017 WL 1100882, at *4. Accordingly, the Court will not conclude that amendment would be futile on the basis of Defendants' "direct threat" defense at this stage.

---

[20] The case cited by Defendants, *Sharikov v. Philips Med. Sys. MR, Inc.*, 659 F. Supp. 3d 264 (N.D.N.Y. 2023), *aff'd*, 103 F.4th 159 (2d Cir. 2024), was an employment case and does not support their argument that Stoytchev's ADA and Rehabilitation Act claims should be dismissed because his allegations establish that he posed a "direct threat." In *Sharikov*, the court concluded that the plaintiff "ha[d] not plausibly alleged that he had a disability," and that was why he "ha[d] failed to plausibly allege a reasonable accommodation claim." 659 F. Supp. 3d at 291. The court's decision was not in any way based on whether or not the plaintiff's allegations established that he was a "direct threat."

[21] *See, e.g.,* FAC ¶ 72 ("The security guards . . . did call police after [Stoytchev] asked for the police to be called to come help him. Thomas called 911 requesting an ambulance, and communicated how [Stoytchev] needed help, was acting 'crazy,' but that he was unarmed."), ¶ 76 ("When the first group of Defendant officers arrived, [Stoytchev] was waiting on or around a public sidewalk in a public area near the Schlobohm entrance and security booth . . . . Even after [Stoytchev] complied with the commands—surrendering by raising his hands and kneeling down—the four Defendants swarmed [Stoytchev] and intentionally engaged in an unnecessary and violent struggle while immediately screaming 'stop resisting!' as a pretext to justify the attack.").

**d. Stoytchev Has Plausibly Alleged that the City Failed to Provide Him with a Reasonable Accommodation**

Defendants are correct that Stoytchev alleges in Count X of the Proposed First Amended Complaint only that "[a]cting with deliberate indifference to Plaintiff's federal rights, the City failed to reasonably accommodate his disability; denied him access to the services, programs, or activities of the YPD on the basis of his disability; and/or otherwise discriminated against him on the basis of his disability." FAC ¶ 189. This allegation, however, is preceded by more detailed allegations elsewhere in the FAC—which are incorporated by reference into the ADA and Rehabilitation Act claims, *see id.* ¶¶ 179, 186—regarding the reasonable accommodations that Stoytchev claims the YPD ought to have made, *see*, *e.g.*, *id.* ¶ 74 ("Some or all of the responding officers, dispatchers, and supervisors were on notice that [Stoytchev] qualified as an EDP . . . . Yet neither the dispatchers nor the supervisors advised responding officers to use de-escalation tactics . . . . The dispatchers and supervisors failed to instruct the responding officers to wait for an available officer better trained in de-escalation to arrive and engage with Plaintiff first."), ¶ 76 ("Rather than de-escalating the situation by giving [Stoytchev] space and approaching slowly, these officers rushed [Stoytchev] and yelled at him to get on the ground . . . . Nieves made no efforts to accommodate what he recognized as [Stoytchev's] altered mental state or EDP status."). And as noted above, "the ADA requires police departments to make reasonable accommodations for disabled suspects." *Felix II*, 2020 WL 6048153, at *4; *see also Short*, 2022 WL 17990106, at *5 (whether or not there was a reasonable accommodation that the police officers could have made is the "type of factual dispute [that] is not amenable to resolution by the Court on a motion to dismiss"). These allegations suffice to state claims of discrimination for failure to make a reasonable accommodation under the ADA and the Rehabilitation Act. *See O'Brien v. City of Syracuse*, No. 22-cv-948 (MAD) (TWD), 2023 WL 6066036, at *12

(N.D.N.Y. Sept. 18, 2023) (in context of fatal police shooting of mentally disabled woman, plaintiff plausibly alleged claim for failure to make reasonable accommodation where complaint alleged various accommodations police could and should have made instead of "escalat[ing] the situation and further exacerbate[ing] [the decedent's] mental health crisis through their actions" (collecting cases)).

* * * * * *

In sum, the ADA and Rehabilitation Act claims relate back to the date of the original Complaint only insofar as they are based on the alleged use of excessive force on October 19, 2019, and the allegations in the Proposed First Amended Complaint with respect to that incident suffice to state ADA and Rehabilitation Act claims. Accordingly, the motion for leave to amend is GRANTED with respect to adding ADA and Rehabilitation Act claims related to the alleged use of excessive force on October 19, 2019, but DENIED with respect to adding ADA and Rehabilitation Act claims related to any of the other alleged uses of excessive force.

### D. *Monell* Claim against the City (Count XI of the FAC)

The Proposed First Amended Complaint also attempts to add a standalone *Monell* claim against the City. The thrust of this claim is a challenge to the YPD's policies, practices, and customs regarding the treatment of EDPs. *See* FAC ¶¶ 192-97. In support of this claim, Stoytchev alleges that the YPD failed to train police officers regarding de-escalation and proper interaction with EDPs, and failed to train dispatchers on how to recognize and handle calls involving individuals showing signs of mental distress. *See*, *e.g., id.* ¶¶ 68, 73, 120-21, 124. Several additional allegations concern other incidents involving EDPs and the YPD investigations related to those incidents. *See id.* ¶¶ 111-18.

In the original Complaint, the allegations of *Monell* liability related only to the City's policies regarding the review of uses of force. More specifically, the original Complaint asserted that the City maintained an "utterly broken system for reviewing and disciplining allegations of excessive force by its officers," including that officers accused of using excessive force "were 'investigated' by fellow YPD officers who were biased in favor of the accused officer and worked to protect their officers from facing meaningful scrutiny for their actions," and that "the Chief of Police deemed nearly every use of force incident that YPD reviewed justified, no matter how plainly egregious the conduct, thereby ratifying the use of excessive force by YPD officers." Compl. ¶¶ 36-39. In Count I of the original Complaint, which asserted a Section 1983 claim under the Fourth Amendment for the use of excessive force, Stoytchev alleged that

> it was obvious to the City's policy makers that its system for reviewing use of force incidents and disciplining officers involved was utterly broken. Rather than holding officers accountable, the system encouraged the cover up of acts of excessive force, thereby tacitly condoning the use of excessive force by officers and in some instances even ratifying it at the policy making level. Notwithstanding the obvious need for a better and constitutionally compliant system, the City's policy makers took no action to actually abate the problem, leaving the broken system in place.

*Id.* ¶ 46.

There are echoes of some of these allegations in the FAC. For example, Stoytchev alleges in the FAC that "[u]nder the City's broken system, officers who are accused of misconduct, and in particular of using excessive force on members of the community, were 'investigated' by fellow YPD officers who were biased in favor of the accused officer and worked to protect their officers from facing meaningful scrutiny for their actions." FAC ¶ 99. But unlike the original Complaint, the FAC centers these allegations on the treatment of EDPs:

> The City was well aware that it maintained an utterly broken system for reviewing and disciplining allegations of excessive force by its officers. This systemic failure was particularly pronounced with regard to incidents

> of the use of excessive force, especially those involving EDPs. In fact, YPD's IAPro/BlueTeam Use of Force early warning system was set up in a way that avoided use of tracking fields designed to monitor EDP interactions.

*Id.* ¶ 101; *see also, e.g., id.* ¶ 103 ("YPD maintains a 'narrative' field with details of the incident and review for these 909 incidents that, upon information and belief, would further demonstrate the superficial investigations, biased reviews and failures to use de-escalation tactics when interacting with EDPs."), ¶ 120 ("EDPs are among the most harmed by [the] YPD's broken system of reviewing allegations of force, and failing to train or evaluate officers on de-escalation. To the extent YPD officers receive training at the police academy concerning EDPs, that training is inadequate and insufficient if not followed by in-service training at [the] YPD. At all times relevant to [Stoytchev's] 2019 injuries, [the] YPD failed to provide adequate in-service training concerning EDPs and de-escalation. The custom and pattern in existence long before [Stoytchev's] 2019 injuries continues to this day."), ¶ 121 ("[The] YPD's lack of policies, and inadequate record-keeping, training, and supervision result in officers encountering people with mental illness or in distress from failing to interact in a manner that respects their rights and that is safe for all involved. [The] YPD unnecessarily escalates such situations, in contravention of recommended guidance and established norms across law enforcement."), ¶ 126 ("Due to the combined acts or omissions of the City and YPD personnel, the police responses described above, particularly in the early morning of October 19, 2019, resulted in instances of [the] YPD's pattern and practice of using force against an EDP that is either unnecessary at all, or higher than necessary or appropriate.").

And the entire focus of the *Monell* claim asserted in Count XI of the FAC is the inadequacy of the YPD's policies and practices related to interactions with EDPs. To wit, Stoytchev alleges that he "was a known EDP to the YPD at minimum throughout all of 2019,

including during each use of force incident alleged in Counts I-V," *id.* ¶ 193; that "[d]ue to the combined acts or omissions of City personnel, including dispatchers, patrol officers and supervisors, the officers did not attempt to de-escalate the situation or employ crisis intervention techniques tailored to EDPs at any point during the use of force interactions described in Counts I-V," *id.* ¶ 194; and that his "injuries were the result of the combined acts or omissions of the City and YPD personnel, including dispatchers, officers and supervisors, as well as the City's deliberate indifference to the rights of citizens generally to be free from excessive force, and in particular to those who are or may be EDPs," *id.* ¶ 195. The original Complaint had no allegations of any policies, practices, or customs related to the treatment of EDPs, and no allegations whatsoever regarding any failures to train police officers and/or dispatchers, let alone failures to train with respect to interactions with EDPs. Moreover, as noted above, the conclusory allegation in the original Complaint that "the City maintained an official policy that was the moving force behind the violation of George Stoytchev's Fourteenth Amendment rights," *id.* ¶ 51, was not supported by any factual allegations and thus furnished no notice of this proposed new *Monell* claim.

In sum, the FAC takes the claim of *Monell* liability in a new direction that is entirely distinct from what was alleged in the original Complaint, and the Court cannot conclude that "adequate notice" of Stoytchev's *Monell* claim related to the treatment of EDPs was provided "by the general fact situation alleged in the original pleading." *Lederman*, 2002 WL 31357810, at *2 (quotation marks omitted). Rather, this amendment "sets forth a new set of operational facts"—it does not "make more specific what has already been alleged." *Id.* (quotation marks omitted). The *Monell* allegations in the original Complaint did not give "the slightest intimation" that they were based on YPD policies, practices, or customs regarding the treatment

of EDPs, and thus this new *Monell* claim does not relate back. *Griffith*, 2009 WL 2524961, at *4; *see Fleming*, 1993 WL 16117, at *2.

Accordingly, Stoytchev's motion for leave to amend to add this claim is DENIED.

## IV. Proposed Amendment to Name Defendants Previously Sued as John Does

The original Complaint asserted the Section 1983 excessive force / failure to intervene claims against officers Stoytchev identified as John Doe 1 through John Doe 5. *See* Compl. ¶¶ 10, 45. The proposed FAC now identifies the John Does, and Stoytchev seeks to add them as defendants.

### A. Timeliness and Relation Back Regarding Newly Named Defendants

As a general matter, John Doe pleadings cannot be used to circumvent applicable statutes of limitations. *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). Accordingly, substitution of John Doe defendants after the limitations period has expired is permissible only where the requirements of Rule 15(c) of the Federal Rules of Civil Procedure are satisfied. *Id.*

For the reasons stated above, the motion for leave to amend is denied as to Counts II and III of the FAC, the claims of excessive force and failure to intervene related to Stoytchev's August 10, 2019 and August 25, 2019 interactions with the YPD. The Court therefore only considers whether Stoytchev may amend the original Complaint to add new defendants related to claims based on his other interactions with the YPD. As explained above, the three-year statute of limitations applicable to the claims arising under Section 1983 asserted in Counts I, IV, and V of the FAC accrued on the dates of each of the incidents in question, *i.e.*, (1) July 29, 2019, (2) September 22, 2019, and (3) October 18-19, 2019, and was then tolled for 228 days due to the COVID-19 pandemic, *see Rich*, 2022 WL 992885, at *8. This means that the respective limitations periods expired on (1) March 14, 2023, (2) May 8, 2023, and (3) June 3-4, 2023. As

a result, amendment of these claims to substitute named defendants for the John Doe defendants is untimely, and Stoytchev may only amend if he can satisfy the requirements for relation back set forth in Rule 15(c).[22]

**B. Relation Back Under Rule 15(c)(1)(C)**

Under Rule 15(c)(1)(C), an amendment identifying a John Doe defendant relates back to the original pleading when the party to be brought in by the amendment "received such notice of the action that it will not be prejudiced in defending on the merits" and "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). The Second Circuit "has interpreted the rule to preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities." *Hogan*, 738 F.3d at 517. "[A]lthough Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties, the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.* at 517-18 (cleaned up). Put differently, "the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity.'" *Id.* at 518.

Here, Stoytchev, in the original Complaint, named John Does as placeholders for the names of unidentified police officers. He did not learn the identities of the officers until discovery, and made clear that at the time of filing the original Complaint, that he was ignorant of their identities rather than mistaken as to their identities. Compl. ¶¶ 10, 45. Accordingly,

[22] Because the Court denies leave to amend to add the First Amendment claim in Count VIII of the FAC, it considers whether Officer Nieves may be added as a defendant only with respect to Count V of the FAC, the claim for excessive force and failure to intervene related to the incident on October 19, 2019.

there was no "mistake" within the meaning of Rule 15(c)(1)(C), and Stoytchev is time-barred from amending the original Complaint to name the John Doe defendants under Rule 15(c)(1)(C).

**C. Relation Back Under Rule 15(c)(1)(A)**

Under Rule 15(c)(1)(A), an amendment relates back to the date of the original pleading if "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A). Since New York law governs the statute of limitations applicable to Stoytchev's Section 1983 claims, the Court considers whether Stoytchev may amend his claims to identify the John Doe defendants pursuant to CPLR § 1024, the New York statute governing amendment to name "unknown parties." *See Hogan*, 738 F.3d at 518-19. That statute provides that

> [a] party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

CPLR § 1024. New York courts have interpreted CPLR § 1024 as permitting relation back of amendments substituting a named party for a John Doe defendant to the time of the original pleading. *See Hogan*, 738 F.3d at 518-19.

For relation back under CPLR § 1024, a party must meet two requirements. *Id*. at 519. "First, the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Id.* (quotation marks omitted). "Second, the party must describe the John Doe party in such form as will fairly apprise the party that he [or she] is the intended defendant." *Id*. (cleaned up). "The onus of identifying an officer defendant's name, or at least making a good faith effort, lies on the plaintiff." *Barrett v. City of Newburgh*, 720 F. App'x 29, 33 (2d Cir. 2017) (summary order).

### 1. Due Diligence

To demonstrate due diligence, a plaintiff must show that he or she took timely steps to identify the correct party before the statute of limitations expired. *See Abreu v. City of New York*, No. 17-cv-6179 (PAE), 2018 WL 3315572, at *5 (S.D.N.Y. July 5, 2018). Although there is no clear rule as to what specific actions a plaintiff must take to satisfy this requirement, "courts have found due diligence where plaintiffs, prior to filing their complaints, submitted discovery requests to the Attorney General's office, made multiple inquiries to the relevant government department, or contacted an official to provide information about the defendant's full identity." *Id.* (cleaned up)*; see Barrett*, 720 F. App'x at 33. "[C]ourts in this District typically find a lack of due diligence only where the plaintiff failed to take any action beyond filing his [or her] original complaint prior to the expiration of the statute of limitations." *Abreu,* 2018 WL 3315572, at *5 (quotation marks omitted).

Here, Stoytchev attempted to identify the relevant officers in late November and December 2019, approximately one month after the last of the alleged excessive force incidents, by visiting YPD precincts in person "a total of at least four times to request the names of officers who were involved in excessive force incidents." ECF No. 129 (Declaration of George Stoytchev) ¶ 3.[23] Stoytchev first visited the YPD's Third Precinct, where he was unable to obtain the officers' names and was directed to the Fourth Precinct. *Id.* ¶ 4. He then visited the Fourth Precinct at least three times in December 2019, seeking the identities of the officers involved in the 2019 incidents. *Id.* ¶ 5. During one visit, Stoytchev explained to the desk officer that he wanted the names of the officers who had "beat" him. *Id.* The officer took his

[23] The Court may consider the declaration in deciding this motion. *See Abreu,* 2018 WL 3315572, at *1 n.1 (noting that courts in this District have considered affidavits from plaintiffs relating to their efforts to identify individual defendants in resolving similar motions).

information and advised that someone from the YPD would contact him. *Id.* After receiving no response for approximately a week, Stoytchev returned to the precinct to follow up, at which point he was turned away and discouraged from "bothering" the officers. *Id.* ¶¶ 6-7.

Although these efforts did not take the form of formal discovery requests, they were timely and persistent attempts by Stoytchev to identify the John Doe defendants before the statute of limitations expired. Even though Stoytchev did not take any further steps to identify the John Doe defendants prior to filing the original Complaint almost three years later, the Court finds that these efforts are sufficient to establish that Stoytchev exercised due diligence in attempting to identify the John Doe defendants. *See Abreu*, 2018 WL 3315572, at *6 ("[P]laintiffs have not explained why they took no further steps prior to filing the original complaint some two years later, on the eve of the expiration of the statute of limitations. Nevertheless, plaintiffs' efforts to ascertain the officers' identities distinguish this case from the majority of cases finding a lack of due diligence in the absence of *any* efforts at identification prior to the expiration of the statute of limitations." (emphasis in original)).

**2. Description of the Defendants**

A plaintiff may amend to identify John Doe defendants under CPLR § 1024 if that defendant would have known, from the description in the original complaint, that he or she was the intended defendant. *See McClain v. Gelormino*, No. 17-cv-0046 (LEK) (ML), 2021 WL 4477192, at *11-12 (N.D.N.Y. Sept. 30, 2021). "This requirement is not particularly arduous." *Abreu*, 2018 WL 3315572, at *6. Courts have generally found the requirement satisfied where the original complaint identifies the time, date, and location of the incident, the role of the unidentified defendant, and the conduct attributed to that defendant. *See Hogan*, 738 F.3d at 519 (plaintiffs adequately described Doe defendants where complaint provided the date, time, and

location of the incident, as well as a physical description of the unidentified defendants); *Duncan v. City of New York*, No. 11-cv-3901 (ENV) (JO), 2014 WL 3530858, at *3 (E.D.N.Y July 15, 2014) (adequate description where complaint listed date and location of the arrest and detailed the actions of the later-identified officer).

**a. July 29, 2019, Incident (Andrew Lane)**

The original Complaint adequately described the John Doe defendant involved in the July 29, 2019 incident. It identified the incident as having occurred on July 29, 2019, at approximately 11:35 p.m., when Stoytchev was a passenger in a friend's vehicle near Buena Vista Avenue and Main Street in Yonkers. Compl. ¶ 17. After Stoytchev exited the vehicle, several YPD officers allegedly approached him, stopped him, turned him around, and forced him back toward the vehicle. *Id.* The officers then searched the vehicle and allegedly discovered controlled substances. *Id.* ¶¶ 17-18. After Stoytchev disputed ownership of the drugs and refused to submit to a "breath test," the officers allegedly threw him to the ground, arrested him, and charged him with "Driving While Ability Impaired" under the VTL. *Id.* ¶ 18. These allegations identified the date, approximate time, location, role, and conduct of the John Doe defendant with sufficient specificity to place Andrew Lane on notice that he was the intended defendant.

**b. September 22, 2019, Incident (Joseph Reagan)**

The original Complaint also adequately described the John Doe defendant involved in the September 22, 2019 incident. It identified the incident as occurring on September 22, 2019, at approximately 3:15 a.m., while Stoytchev was standing in front of 7 Schroeder Street in Yonkers waiting for a friend. *Id.* ¶¶ 23-24. After Stoytchev had an altercation with another individual from an adjacent vehicle, YPD officers allegedly arrested Stoytchev, threw him to the ground,

"hog-cuffed" him, and sat on him, making it difficult for him to breathe. *Id.* ¶ 25. These allegations identified the date, approximate time, location, role, and conduct of the John Doe defendant with sufficient specificity to place Joseph Reagan on notice that he was the intended defendant.

**c. October 18-19, 2019 Incident (Joseph Nieves, Thomas Ball, and Richard Windisch)**

The original Complaint also adequately described the John Doe defendants involved in the October 18-19, 2019 incident. It identified the incident as beginning on October 18, 2019, at approximately 11:00 p.m., at the Schlobohm Houses on Schroeder Street in Yonkers, where Stoytchev was arrested and removed from the property after engaging in a verbal dispute with his girlfriend. *Id.* ¶¶ 28-29. After Stoytchev was released, he returned to the vicinity of the Schlobohm Houses to retrieve his personal belongings, only to find that his girlfriend was no longer there. *Id.* Eventually, after receiving a call from a security officer at the property, more than six patrol cars carrying approximately eight YPD officers responded to the scene. *Id.* ¶¶ 29-30. According to Stoytchev, the officers approached with their weapons drawn, ordered him to the ground, handcuffed him, shackled his legs, placed a knee on his neck, and kicked him in the back of his head. *Id.* ¶¶ 30-31. These allegations identified the date, approximate time, location, role, and conduct of the John Doe defendants with sufficient specificity to place Joseph Nieves, Thomas Ball, and Richard Windisch on notice that they were the intended defendants.

**d. New John Doe Defendants**

While the Proposed First Amended Complaint purports to identify the previously unidentified John Doe defendants included in the original Complaint, it nevertheless attempts to assert claims against other new unidentified John Doe defendants in Count IV in connection with the September 22, 2019 incident and in Count V in connection with the October 18-19, 2019

incident.[24] According to the Proposed First Amended Complaint, the new John Doe 1 through John Doe 5 "are designated as other as-yet-unidentified defendant *City employees* who might have been present, or directed actions at, the scene of Plaintiff's encounters with YPD . . . ." FAC ¶ 25 (emphasis added). The original Complaint described the original John Doe 1 through John Doe 5 as "other as-yet-unidentified defendant *police officers* who might have been present at the scene of plaintiff's encounter with the police . . . ." Compl. ¶ 10 (emphasis added). Stoytchev makes no argument that he has been unable to identify all of the individuals involved in either the September 22, 2019 or October 18-19, 2019, incidents or that the identification of the new individual defendants in the FAC is somehow incomplete. Indeed, in his moving papers, Stoytchev states that his proposed amendments should be permitted because "little or no additional discovery is required . . . ," ECF No. 117 at 5, implying that he has already obtained the information necessary to identify the John Does included in the original Complaint and to now name them in the Proposed First Amended Complaint through the extensive discovery that has already taken place. Stoytchev has thus provided no reason why he should be able to amend the original Complaint to include new unidentified defendants well past the statute of limitations. Accordingly, Stoytchev's motion for leave to amend is DENIED to the extent that he seeks to include any new John Doe defendants in the Proposed First Amended Complaint, since such amendment is time-barred and does not relate back.

* * * * * *

[24] The only Counts asserted against the new potential John Doe defendants are Counts III, IV, and V. But the Court need not address the propriety of naming a new John Doe defendant in Count III in connection with the August 25, 2019 incident since, as explained in Discussion Section II, *supra*, the motion for leave to amend is denied as to Count III.

In sum, the original Complaint adequately described the John Doe defendants involved in the July 29, September 22, and October 18-19, 2019, incidents. Accordingly, relation back under CPLR § 1024 is appropriate as to Officers Andrew Lane, Joseph Reagan, Joseph Nieves, Thomas Ball, and Richard Windisch, and Stoytchev's motion for leave to amend is GRANTED to the extent he seeks to amend the original Complaint to substitute these defendants for the previously unidentified John Doe 1 through John Doe 5 with respect to Counts I, IV, and V of the FAC. As explained above, however, to the extent that Stoytchev seeks to add new unidentified John Doe defendants in Counts IV and V of the FAC, his motion is DENIED.

**CONCLUSION**

For the foregoing reasons, Stoytchev's motion for leave to amend the complaint (ECF No. 116) is GRANTED IN PART AND DENIED IN PART.

By **October 21, 2026**, Stoytchev must file a First Amended Complaint that is revised to comport with the rulings in this Decision and Order. At the time of the filing, Stoytchev must also request that the Clerk of Court issue summonses for the newly-named defendants. By **November 4, 2026**, counsel for Defendants must submit a letter to the Court indicating whether or not they are representing new defendants Andrew Lane, Joseph Reagan, Joseph Nieves, Thomas Ball, and Richard Windisch, and whether or not they are authorized to accept service of the First Amended Complaint on any or all of those defendants. If counsel are representing the newly-named defendants, this letter must also indicate whether or not defendants Lane, Reagan, Nieves, Ball, and Windisch consent to proceed before the undersigned for all purposes in accordance with 28 U.S.C. § 636(c). If counsel are not authorized to accept service for whatever

reason, the First Amended Complaint must be served on these newly-added Defendants by **December 4, 2026**.

A video status conference to discuss the next steps in this matter is hereby scheduled for **November 6, 2026 at 11:00 a.m.** The Court will send a video link to counsel in advance of the conference. The parties are directed to discuss any outstanding discovery and propose a schedule for completing the remaining discovery; the proposed discovery schedule must be filed on ECF by no later than **November 4, 2026**.

Dated: October 7, 2026
White Plains, New York

**SO ORDERED.**



ANDREW E. KRAUSE
United States Magistrate Judge